**STATE of Tennessee, Appellee,**

v.

**Jeris E. BRAGAN, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

July 5, 1995.

Permission to Appeal Denied by Supreme Court Jan. 8, 1996.

---

John E. Herbison, Thomas F. Bloom, Nashville, TN, for Appellant.

Charles W. Burson, Attorney General & reporter, Merrilyn Feirman, Asst. Attorney General, Nashville, TN, J. Michael Taylor, District Attorney, Pro Tem., Steven Blount, Asst. District Attorney General, Dayton, TN, for Appellee.

## OPINION

HAYES, Judge.

The appellant, Jeris E. Bragan, appeals from a conviction of first-degree murder entered in the Criminal Court for Hamilton County. The appellant raises the following issues for our review:

(1) whether due process bars retrial of the appellant due to "outrageous" prosecutorial misconduct;

(2) whether the appellant's conviction should be vacated and the indictment dismissed under the court's "inherent supervisory authority";

(3) whether the appellant's conviction should be vacated and the indictment dismissed for prosecutorial vindictiveness;

(4) whether the evidence is sufficient to sustain a verdict of guilty;

(5) whether marital privilege should have barred the testimony of the appellant's wife;

(6) whether the trial court erred in admitting hearsay testimony that the victim thought that the appellant was going to kill him;

(7) whether the appellant's statements to the police were products of an unlawful seizure;

(8) whether the appellant was denied effective cross-examination of a witness;

(9) whether the testimony of a State's expert witness exceeded the scope of his expertise;

(10) whether the testimony of an expert witness for the defense invaded the province of the jury;

(11) whether the trial court improperly limited redirect examination of a defense witness; and

(12) whether certain portions of a stipulated exhibit were improperly redacted.

After a review of the record, we affirm the judgment of the trial court.

### Introduction

In March 1977, the appellant and his wife at that time, Darleen Whary Bragan, were indicted for the November 22, 1976 murder of George Urice. In September of the same year, a Hamilton County jury found the appellant guilty of first-degree murder and his wife guilty of second-degree murder.[1] The appellant received a sentence of ninety-nine years. His conviction was affirmed by this court on January 18, 1979, and permission to appeal was denied by the Tennessee Supreme Court on April 9, 1979.

In 1992, the appellant sought habeas corpus relief in the Federal District Court for Middle Tennessee. After conducting an evidentiary hearing, the district court granted the appellant's petition for writ of habeas corpus. The district court found by a preponderance of the evidence that the "State failed to disclose exculpatory evidence to the defendant and failed to correct materially false and misleading statements made at trial by prosecutors and by the State's key witness." *Bragan v. Morgan,* 791 F.Supp. 704, 721 (M.D.Tenn.1992). The court ordered the appellant released from custody if a new trial was not granted within sixty days. The appellant was released in compliance with the court's order after serving fifteen years of his ninety-nine year sentence.

The appellant was retried in January, 1994 and was again found guilty of first-degree

---

1. Darleen Whary Bragan received a fifteen to twenty-five year sentence. Her sentence was modified on appeal to a determinate sentence of fifteen years. She was paroled in 1984 and her sentence has now expired.

murder. He received a sentence of ninety-nine years in the Department of Correction.

### Facts

The following proof was developed at the appellant's second trial in January 1994. In 1976, the appellant and Mr. George Urice were in the private investigation business in Chattanooga. The appellant was president and principal owner of a detective agency named Searchers, Inc., which employed Urice as an investigator. The appellant's wife, Darleen Whary Bragan, worked as a secretary and part-time investigator at the agency. The agency was located in Apartment 116 of the Stratford Apartments in Hixson. The appellant and his wife resided in an apartment located in the same complex. In the fall of 1976, the appellant and Urice contacted Phil Smartt, a local Mormon preacher and insurance salesman, concerning the purchase of a "key man" life insurance policy for the corporation. Eventually, Smartt issued a policy on the lives of both the appellant and Urice, with coverage of $100,000 for each individual. In the event of the accidental death of either party, the policy would pay $200,000. At the request of the appellant, Searchers, Inc. was designated the beneficiary of the policy. Bragan was covered immediately, but Urice's coverage, due to his age, was effective upon completion of a medical review. The policy became effective October 13, 1976.

The record indicates that Urice was unhappy with his business and personal relationship with the Bragans, and had expressed fear and distrust of the couple. On more than one occasion, he told his wife that he felt like the appellant was going to kill him for the insurance proceeds. He told Smartt, who doubled as Urice's minister, that the Bragans were "amoral." Also, his paycheck had bounced on several occasions, and he talked of seeking employment with other detective agencies in the area.

On the evening of November 22, 1976, Dwayne Pitts, an Emergency Medical Technician for Hamilton County, was dispatched to the office of Searchers, Inc. When he arrived, he found George Urice's body lying on the floor directly beneath a carpeted stairway, blocking the front door. Urice had injuries to the face and head, and his body was badly swollen. Splatters of blood were present on the floor and the walls at the bottom of the stairway. Pitts called the police, who arrived shortly thereafter.

Detectives with the Chattanooga Police Department inspected the scene, gathered evidence and took photographs. The detectives observed a broken tooth and fingernail on the stairwell, scuff marks on the wall at the top of the stairs, and what appeared to be blood on soap and a towel in the downstairs bathroom. They also noticed that the appellant had blood on his clothing, and that a chair with two broken legs was on the floor near the victim. The appellant told the detectives that he was not present when Urice was killed, but that Urice had been drunk and that he must have accidentally fallen down the stairs. He also told detectives that when he discovered the body, it was lying over a chair.

Sometime after the police arrived at the scene, the deputy coroner for Hamilton County arrived. The coroner, along with the police, noticed that the victim had indentations around his wrists, and a mark on his back in the pattern of handcuffs. The deputy coroner and detectives attached handcuffs to the victim's wrists, and held them up to his back. The indentations on the victim's wrists and the mark on his back perfectly matched the outline of the officer's handcuffs.

Later that evening, Detective William Dixon took the statement of the appellant at the police station. The appellant told Dixon that he and his wife had planned to fly to Washington D.C. on the night of the 22nd, and that Urice had agreed to drive them to the airport. According to the appellant, when he came to the office between 10:30 and 11:00 a.m., Urice was already there. The appellant's wife showed up a few minutes later, and the three of them stayed in the office until 12:30 p.m., discussing business and drinking coffee with brandy. The appellant told Dixon that at 12:30 they went to a local restaurant, where they ate lunch and had several drinks. They returned to the office around 2:30 p.m., where they talked and drank until 5:15 or 5:30 p.m. At that time,

the appellant and his wife left Urice at the office and went to their apartment to pack. According to the appellant's statement, they were out of cigarettes, so they went to a local restaurant to buy some. Sometime later, they returned to the office and found that the front door was blocked. The appellant told Dixon that he saw blood on the floor and the top of the victim's head, and, realizing that something was wrong, he went around to the back of the office, broke the sliding glass door with a tire iron, entered and found the body of the victim. He then moved the body to determine whether Urice was still alive. The appellant couldn't remember whether the body was lying over a chair. The appellant denied killing the victim, stating that he was his best friend and that the victim's wife was "the closest thing to a mother that his wife has." The appellant also stated that he did not see any handcuffs when he moved the body, and he could not recall the position of the body when he found it.

The appellant's wife at the time of the murder, Darleen Whary, testified for the State.[2] Whary testified that early in the fall of 1976, the appellant started discussing with her how he was going to kill Urice. According to her testimony, the appellant told Whary that he was going to kill Urice for the proceeds of the key man insurance policy and because he feared Urice. The appellant told her that he planned to get Urice drunk and push him down the stairs of the office, making it look like an accident. Whary testified that when she arrived at the office on November 22, 1976, the appellant and Urice were there. The three of them talked for awhile, then went to lunch at a local restaurant, where they had several drinks. They then drove back to the office. Whary testified that upon arriving at the office, the appellant went to check the mail, leaving Whary and Urice in the car. Shortly thereafter, the appellant joined Whary and Urice in the office. The three individuals then sat around in one of the upstairs offices and had more drinks. According to Whary's testimony, Urice was not drinking fast enough to suit the appellant, so the appellant urged him

to drink. When Urice resisted, the appellant produced a gun and forced him to drink. When Urice again began to resist, the appellant had Whary hold the gun while he handcuffed Urice behind his back and poured scotch into his mouth and forced him to drink. According to Whary, at some point after this, the appellant placed gauze in Urice's mouth and adhesive tape over his mouth, and began "talking mean and ugly to him, like you do someone that you're trying to humiliate or dehumanize." The appellant then got up and led Urice to top of the stairs. Whary testified that at this point, she went downstairs into the kitchen. The next thing she heard was "a crash and a thud." She then went into the entrance area of the office where she saw Urice lying in a crumpled heap on his right side at the bottom of the stairs. The appellant was standing over Urice. Whary testified that the appellant determined that Urice was still alive by checking his pulse, then retrieved a nightstick from a supply closet and "held it up to [Urice's] throat until there was no more air."

Whary testified that after killing Urice, the appellant said "[n]ow we have to go and be seen some place so people will see us during this time, and we have to get rid of these handcuffs and nightstick." According to Whary, they then drove toward Chickamauga Lake. On the way, Whary, at the request of the appellant, threw the nightstick into some weeds by the side of the road. The appellant then threw the handcuffs into Chickamauga Lake. After disposing of the handcuffs, the appellant and Whary drove to Denny's restaurant, where Whary entered and bought a pack of cigarettes. Whary testified that they then proceeded to the office and pretended to discover Urice's body. The appellant then broke a chair to make it look like Urice was carrying a chair downstairs and fell down the steps. According to Whary's testimony, the appellant removed the tape and gauze from the victim's mouth, moved the body to deceive the coroner and called paramedics.

Whary testified that she did not know what exactly occurred between the appellant

---

**2.** The appellant and Ms. Whary were divorced sometime between the two trials. Ms. Whary did not testify at the first trial.

and Urice at the top of the stairs. On cross-examination, Whary testified that she never saw the appellant strike a blow to Urice's head.

Elizabeth Teal Sizer–Haven testified that she lived at the Stratford Apartments, next door to the appellant's office, in 1976. She was sixteen at the time. She testified that at 6:00 p.m. on November 22, 1976, she heard loud sounds from the upstairs portion of the appellant's office. A few minutes later she heard a loud thud or crash coming from the bottom of the stairwell of the appellant's office. At 6:15, she heard the sliding glass door of the appellant's office "hitting and closing really loud." Another resident of the Stratford Apartments at the time testified that around 6:15 or 6:30 on the 22nd, she saw the appellant running around the back of the building with something in his hand. Also, the testimony of the apartment manager at the time of the killing from the 1977 trial was read into the record. The manager testified that at 4:00 or 4:30, she saw a gray-haired man and the appellant's wife get out of a car and go into the appellant's office.[3]

Dr. George Beckmann, county coroner and county medical examiner for Hamilton County in 1976, testified that a post-mortem examination of Urice was conducted the day after he was killed. Dr. Beckmann testified that Urice had a laceration approximately one and one-half inches long over his left eye, a cut lower lip on the right side of his mouth, contusions around his left eye, multiple contusions and bruising of the head and neck, depression marks from some sort of restraint on both wrists, and an imprint of a handcuff on his back. Dr. Beckmann testified that the victim had liver mortis from the back of his neck to the upper buttocks of his back, meaning that the body had been lying on its back for forty-five minutes to an hour after death. He testified further that the handcuff impressions on the victim's wrists occurred before death, and the imprint on his back occurred after death. The victim was also missing a front incisor, and the gum was still raw in the place where it had been located. Dr. Beckmann testified further that the victim had a large fracture of the skull (four and-a-half inches) over the right parietal area and a marked edema (swelling) to the brain. According to Dr. Beckmann, the victim died as a result of a severe beating to the head and the edema of the brain that resulted from the injuries. He testified that the appellant had received at least four or five blows to the head. Beckmann performed a blood alcohol test, which revealed that the victim had a blood-alcohol content of .23 percent. Finally, Dr. Beckmann testified that the head injuries could not have been caused by a fall down the carpeted stairs in the appellant's office. According to Dr. Beckmann, the only injuries consistent with a fall down those particular stairs were the cut lip and missing tooth.

As part of its case in chief, the prosecution read into the record the 1976 lab reports of two forensic scientists from the Tennessee Bureau of Investigation. The first report revealed that blood on the appellant's clothes matched the victim's blood, that tests on the bathroom towel, nightstick and handcuffs gathered at the scene indicated the presence of human bloodstaining, but the samples were insufficient for further tests, and that there was no indication of bloodstaining on the soap from the office bathroom. The second report revealed that the fingernail found on the stairs of the office was a female fingernail, and that there was no evidence of breaking or tearing of the fingernail.

The defense offered the theory that it was not the appellant, but the appellant's wife, Darleen Whary, who committed the murder. Several witnesses testified in furtherance of this theory. Rick Sharp testified that he was acquainted with the Bragans and had worked for Searcher's Inc. in 1975–76. After the appellant's conviction, Sharp had become close friends with the appellant through his work with the prison ministry of a Chattanooga area church. Sharp testified that he had a date with Whary shortly after the first trial, while Whary was free on appeal bond. Sharp testified that during their date, Whary related the following account of what transpired on the date of Urice's killing. Whary and Urice were alone in the office after lunch. Urice was drunk, and the two of

3. At the time of the murder, the victim had gray hair and the appellant had blonde hair.

them started arguing. Whary pushed Urice, who fell and hit his head on a chair. While he was in a semi-conscious state, Whary handcuffed him. She was directing him towards the stairs when he tripped and fell to his death. Sharp testified further that in the fall of 1982, he visited Whary at the state prison for women in Nashville. According to Sharp, during the visit he asked her why she wouldn't tell the truth and let the appellant go free. Whary allegedly became angry at this suggestion, stated that the appellant deserved to be in prison, and "patted down" Sharp for "wires". On cross-examination, Sharp admitted that he had visited Whary in prison at the appellant's request.

The appellant testified in his own defense. He testified that after returning from lunch on the date of the murder, he left his wife and Urice at the office, went to his apartment and fell asleep on the couch. Around 5:00 p.m., he was awakened by his wife, who told him that Urice had fallen down the stairs and was dead. According to the appellant, he then ran down to the office and went in through the sliding glass door in the back. He walked into the living room and saw Urice at the bottom of the stairs. He went to check the victim for a pulse, and discovered that he was handcuffed. The appellant testified that at this point he lifted the appellant's body and removed the handcuffs. He then started to call for medical assistance but was stopped by his wife. According to the appellant, he asked his wife what had happened and she said that Urice was drunk and had approached her from behind and grabbed her breasts and crotch. She had pushed him away, and he had fallen backwards and hit his head on a chair. The appellant testified that Whary told him that she then handcuffed Urice, and led him to the stairs, where he tripped and fell. The appellant admitted that he broke the chair to make it look like an accident and disposed of the handcuffs and nightstick, although he stated that he threw both items into Chickamauga Lake. The appellant testified that he concealed evidence, lied to the police and lied

in the first trial in order to "protect his family." In his testimony, the appellant admitted that he had been found guilty of wiretapping, a federal offense, in 1972.

The appellant testified that because he suffers from hypoglycemia,[4] it was difficult for him to think. The defense read into the record testimony from the 1977 trial of two doctors to establish that the appellant suffers from hypoglycemia. First, Dr. William Kutzner testified that he had diagnosed the appellant as hypoglycemic in 1975. Dr. Carl E. Humiston testified that after the appellant was arrested, he performed a series of tests on him and discovered that he was "allergic" to several foods, including foods and alcohol that he had ingested on the day of the murder. According to Dr. Humiston, ingestion of these foods has various effects on the appellant, including making him dizzy and affecting his ability to think.

The defense called two doctors to contradict the cause of death as determined by the medical examiner. Both doctors' medical opinions were based upon their examination of the autopsy report prepared by the medical examiner's office and the autopsy photographs. Dr. Myron Mills, an emergency physician, testified that the victim was not killed by blows to the head and that the edema to the victim's brain was probably not caused by the fracture to the skull. Mills testified further that the victim most likely died as a result of "some type of compromise in the victim's airway or anything that would have affected his ability to breathe." Dr. Mills also testified that the autopsy was neither thorough nor complete. Dr. Kris Lee Sperry, a forensic pathologist from Atlanta, also testified that head injury was not the cause of death.[5] He testified that there was no evidence of strangulation, and that the injury to the victim's neck was too low to cause strangulation. He further stated that the adhesive tape would have left marks and bits of adhesive material on the appellant's face, none of which was evident in the photographs. Dr. Sperry also testified that many

4. Hypoglycemia is a condition of an abnormally low level of glucose in the blood.

5. Dr. Sperry also testified that the fracture to the victim's skull was only about "a centimeter in length, somewhere around three-sixteenths to a quarter of an inch, approximately."

of the injuries suffered by the victim were consistent with falling down the stairs of the office, and that the injuries to the right side of the head, lower lip and forehead were consistent with being kicked by a hard soled shoe. Finally, Dr. Sperry testified that he could not state the cause of death with reasonable medical certainty.

At the conclusion of the testimony, the jury returned a verdict of guilty. The appellant was sentenced to ninety-nine years imprisonment, and now appeals from the verdict.

## I. Prosecutorial Misconduct, the Court's Inherent Supervisory Power and Retrial of the Appellant

The appellant's first three assigned errors deal with the issue of whether the appellant should have been retried after his conviction was vacated by the federal district court in a habeas corpus proceeding. The appellant contends that a new trial was improper for the following reasons: (1) the misconduct of the prosecutors in the first trial was so outrageous that due process principles bar the State from obtaining a second conviction; (2) the prosecutorial misconduct in the first trial is sufficiently egregious to order dismissal based upon the judiciary's inherent supervisory authority; and (3) the record shows a prima facie case of prosecutorial vindictiveness, which has not been rebutted by the State.

A key witness for the prosecution in the 1977 trial was William Harold "Buggy" Torbett. Torbett had been indicted the previous year for burglary and receiving stolen property. Attached to the latter charge was an habitual criminal count, which, under then-existing Tennessee law, would have enhanced Torbett's sentence to life imprisonment if proved by the State.[6] Before the State was aware of any connection between Torbett and the appellant, the State had offered to dismiss the receiving stolen property charge and the habitual criminal count which accom-

panied it. However, on the date that Torbett was to plead guilty to the burglary charge, he escaped during the court's lunch recess and fled the State. He was arrested a month later and indicted on an additional charge of fraudulent breach of trust. After he was recaptured, he found himself in the same cell as the appellant, and shortly thereafter he approached the prosecution with information concerning the appellant's involvement in the murder of Urice.

During its opening statement, the prosecutor informed the jury that there was no agreement to extend leniency with any particular witness. On direct examination of Torbett, the State elicited the following testimony:

Q. Now, you have some cases pending against you right now. Do you recall what the offenses are that you're charged with right now?

A. One burglary and larceny, and one receiving and concealing stolen drugs, breach of trust;

Q. All right, breach of trust. That's fraudulent breach of trust?

A. Yes, sir.

Q. All right, and a habitual criminal statute is attached to one of those cases, is that right?

A. Yes, sir.

Later in direct examination, the following exchange took place:

Q. Now, Mr. Torbett, you're charged with some offenses here in Hamilton County right now. Has anything been promised to you in regard to those charges against you for your testimony here in court?

A. No, sir.

Q. Have you been promised any leniency in the form of probation or parole, to reduce sentences?

A. No, sir.

On cross-examination, Torbett again testified that he had not been promised anything by the State and that he faced a life sentence as

---

6. The Tennessee Habitual Criminal Act did not create a separate offense, but only enhanced a defendant's punishment to life imprisonment for being convicted of a certain number of felonies. Under the Act, in order for a defendant to be declared an habitual criminal, the State was required to establish that the defendant had three prior felonies, two of which had to be among a list of felonies enumerated in the statute. See Tenn.Code Ann. § 39–1–801 (repealed 1989).

a habitual criminal at his trial scheduled later that month. In closing arguments, the prosecutor asserted that no bargain had been made with Torbett, reiterated that the State had not promised to drop the habitual criminal count and stated that he would be treated like any other defendant.

Approximately one month after the appellant was convicted in 1977, Torbett entered the plea he had negotiated with the State prior to his escape nearly eight months earlier. Upon his plea of guilty to the burglary charge, the stolen property charge was dismissed, along with the attached habitual criminal count. Torbett was sentenced to five to eight years, and was placed in the county workhouse, where he was granted the status of trusty. Less than a year after being sentenced, Torbett escaped from the workhouse. As of 1992, no arrest warrant had been issued for his capture, and he remained at large.

After his 1977 conviction, the appellant filed a motion for a new trial. Among the grounds alleged in the motion were that the prosecution did not disclose Torbett's plea bargain and that the prosecution knowingly allowed perjured testimony at trial. The trial court overruled the motion after a hearing, and this court affirmed the judgment of the trial court. With regard to the first allegation, this court stated:

> There was sufficient evidence adduced at trial and at the new trial hearing to support the conclusion that even though Torbett's testimony in this case did not affect the terms of his pre-existing plea bargain, the assistant district attorney general did disclose that Torbett had charges pending against him and that an agreement had been reached with regard to those charges.

With regard to the second allegation, this court stated:

> The contention that the state knowingly allowed perjured testimony is also unfounded. Torbett's testimony that he still faced the habitual criminal charge was elicited by the defense on cross-examination to weaken his testimony that he had received no promise of leniency. The charges against him had not been disposed of, and to the extent that he misunderstood the

charges with which he was faced, the appellants were assisted in casting doubt on his testimony.

After exhausting his state remedies, the appellant filed a petition for writ of habeas corpus in federal district court, seeking to have his 1977 conviction overturned based upon the prosecutor's misconduct concerning Torbett's testimony. The district court found merit in the appellant's argument, and reversed his convictions under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). In the findings of fact, Judge Nixon stated:

> [T]he Court is persuaded, by the preponderance of the evidence, that the State and Torbett had at least an implicit understanding that in exchange for Torbett's testimony at trial, he would receive lenient treatment. The Court also finds by convincing evidence that under the State's own admissions, defense counsel and the jury were misled about Torbett's pending charges. Although it is evident that the defendant knew of Torbett's February plea agreement [before his first escape], the Court is convinced that defense counsel believed the agreement was called off and not pending while Torbett testified.

*Bragan v. Morgan*, 791 F.Supp. 704, 711 (M.D.Tenn.1992). The federal district court ordered the appellant released from custody if not granted a new trial within sixty days from entry of the court's order.

The State complied with the federal district court's order and released the appellant from custody. On March 31, 1993, almost one year after entry of the federal district court's order, the case was reinstated on the trial court's docket upon motion of the State. Upon motion of the appellant, the trial court disqualified the Hamilton County District Attorney's office from prosecuting the case and appointed a district attorney general *pro tem*. The prosecutor *pro tem* went forward with the prosecution and the appellant's second trial. The trial court allowed the trial to proceed over the appellant's objection. The appellant now contends that the trial court erred in declining to dismiss the indictment.

It is obvious from the record that the district court's findings differ significantly from the findings of the trial court and this court on direct appeal. However, accepting the correctness of the district court's findings, we conclude that although the appellant's due process rights were violated, reversal of the appellant's 1977 conviction was the appropriate remedy for the prosecutor's misconduct, not dismissal of the indictment. We will address the appellant's specific contentions in turn.

## A. *Due Process*

■ The appellant contends that the overreaching and flagrant misconduct of the district attorney at the 1977 trial is so outrageous that due process principles bar the State of Tennessee from involving judicial process to obtain a conviction. The appellant cites no Tennessee authority wherein an indictment has been dismissed based upon prosecutorial misconduct. However, in at least one case where this court found misconduct more egregious than in the instant case, we held that a new trial was the proper remedy. In *State v. Spurlock,* 874 S.W.2d 602 (Tenn.Crim.App.1993), this court found that the prosecution failed to advise the defendant that several witnesses identified someone other than the defendant as the person who either killed the victim or participated in the murder. Id. at 606–609. Also, the court found that the State failed to correct false testimony concerning lenient treatment afforded a State's witness, and did not furnish defense counsel with the audio and video tape recording of a key prosecution witness. *Id.* at 614–615. Despite the nature and extent of the violations, this court specifically rejected the defendant's request for dismissal of the indictment and ordered a new trial. *Id.* at 622.

The facts of this case do not evince prosecutorial misconduct at the same level of egregiousness as determined by this court in *Spurlock.* The record is undisputed that the plea negotiation reached and ultimately implemented with Torbett and his attorney had been agreed upon in February 1977, one month prior to the indictment of the appellant. It is further undisputed that this plea

agreement was unrelated to the appellant's case. It should also be pointed out that the district attorney elicited no false testimony at the appellant's trial. As the federal district court pointed out:

> Taking as true the State's claim that the plea bargain was not made in exchange for Torbett's testimony, on careful reading of Torbett's testimony and the prosecutor's closing argument, one could argue that the evidence presented was not perjurious. The questions posed to Torbett centered on whether a quid pro quo bargain had been struck, rather than any bargain whatsoever. Since the plea bargain had been consummated at the time of trial, it would be technically correct to say that Torbett still faced life in prison under the habitual criminal charge.

*Bragan v. Morgan,* 791 F.Supp. at 713 n. 6. We recognize, however, that Torbett's testimony and the prosecution's closing argument could have led the jury into thinking that no agreement whatsoever had been reached, and that Torbett was still facing life imprisonment as a habitual criminal. If we accept the State's position that the original plea agreement was still in effect, then the State's representations to the jury were misleading. The proof, however, only supports a conclusion that, at the most, the prosecution failed to correct misleading testimony during the appellant's cross-examination and misled the jury during closing argument. While the federal district court found the prosecutor's misconduct was serious enough to mandate a new trial, we hold that this conduct does not reach the height of impropriety as argued by the appellant. We conclude that the prosecutors' misconduct in this case does not warrant a dismissal of the indictment.

The cases cited by the appellant for dismissal of the indictment are unpersuasive. A number of these cases were predicated upon a finding of "outrageous" government conduct. We do not find the conduct in this case to be "outrageous." In the remaining cases cited by the appellant, the courts' rulings were based upon a systematic pattern of abuse, *see United States v. Banks,* 383 F.Supp. 389 (W.D.S.D.1974); intentional destruction of subpoenaed records, *see United*

*States v. Pollock,* 417 F.Supp. 1332 (D.Mass. 1976); repeated misconduct by prosecuting attorneys including intentional withholding of vital evidence, *see United States v. Isgro,* 751 F.Supp. 846 (C.D.Cal.1990); and suppression of evidence, condoning false testimony and cash payments to government witnesses to "get" the defendants, *see United States v. Acosta,* 386 F.Supp. 1072 (S.D.Fla.1974). Again, the level of misconduct in the instant case did not rise to the level that existed in any of these cases.

### B. *Dismissal Based Upon the Judiciary's Inherent Supervisory Authority*

 The appellant argues that should this court not dismiss the indictment based upon a violation of due process, dismissal of the indictment is warranted under the judiciary's inherent supervisory authority. We agree that the courts of this state have the inherent power to supervise and control their own proceedings and to sanction attorneys. *See Andrews v. Bible,* 812 S.W.2d 284 (Tenn. 1991). However, the appellant cites no authority, nor are we aware of any, that would permit this court to dismiss an indictment returned by a grand jury under the concept of inherent supervisory authority. Moreover, even if we had such authority, the district attorney's conduct in this case does not approach the level of egregiousness that would give rise to its implementation.[7]

### C. *Prosecutorial Vindictiveness*

 The appellant also argues that prosecution was reinstated against him after his ordered release from prison in retaliation for, or in order to chill the exercise of his First Amendment right to free speech and expression. Specifically, the appellant alleges that the decision to retry him was based upon public criticism of the district attorneys office in both the print and broadcast media of Hamilton County and due to publication of the appellant's book "detailing the prosecu-

tion's fraud" during his first trial.[8] Accordingly, the appellant urges that dismissal of the indictment is warranted. We disagree.

After the appellant's case was reinstated on the docket, the appellant was successful in the removal of the Hamilton County District Attorney's office from the case. A district attorney general *pro tem* was appointed to prosecute on behalf of the State. The Hamilton County District Attorney's Office had no involvement in the appellant's second trial. Under these circumstances, we conclude that dismissal of the indictment for prosecutorial vindictiveness is not warranted.

### II. *Sufficiency of the Evidence*

The appellant challenges the sufficiency of the evidence to sustain a conviction for first-degree murder. Specifically, the appellant argues that the testimony of Whary, who was an accomplice in the crime, was unbelievable and not sufficiently corroborated.

 A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn.1982). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Harris,* 839 S.W.2d 54, 75 (Tenn. 1992). It is the appellate court's duty to affirm the conviction if the evidence, viewed under these standards, was sufficient for any rational trier of fact to have found the essential elements of the offenses beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 317, 99 S.Ct. 2781, 2789, 61 L.Ed.2d

---

7. The appellant cites *United States v. Banks,* 383 F.Supp. 389 (W.D.S.D.1974), and several other federal cases for the proposition that this court has the inherent authority to dismiss an indictment for prosecutorial misconduct. However, the inherent authority of federal courts is not at issue in this case. We find these cases to be unpersuasive.

8. Bragan, Jeris E., *Beyond Prison Walls The Jeris Bragan Story,* Review and Herald Publishing Association, Hagerstown, MD 1993.

560 (1979); *State v. Cazes,* 875 S.W.2d 253, 259 (Tenn.1994); Tenn.R.App.P. 13(e).

■ We first deal with the appellant's contention that Ms. Whary's testimony was unbelievable. The appellant submits several examples of Whary's testimony that the appellant considers as conflicting with other testimony in the case. However, the jury is the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of the witnesses. *Cabbage,* 571 S.W.2d at 835. A jury verdict, supported by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the State's theory. *State v. Williams,* 657 S.W.2d 405, 410 (Tenn.1983). By returning a verdict of guilty, the jury found Whary's testimony to be credible. We can find no reason to interfere with that finding.

■ The appellant also contends that Whary's testimony was not sufficiently corroborated. In Tennessee, a defendant may not be convicted solely upon the uncorroborated testimony of an accomplice. *See, e.g., State v. Bigbee,* 885 S.W.2d 797, 803 (Tenn. 1994). Such corroborating evidence "may be direct or entirely circumstantial, and need not be adequate, in and of itself to support a conviction," as long as it "legitimately tends to connect the defendant with the commission of the crime charged." *Bigbee,* 885 S.W.2d at 803 (quoting *State v. Gaylor,* 862 S.W.2d 546, 552 (Tenn.Crim.App.1992), *perm. to appeal denied,* (Tenn.1993)). However, "it is not necessary that the corroboration extend to every part of the accomplice's evidence." *Id.* Also, the corroboration may be sufficient although "the evidence is slight and entitled, when standing alone, to little consideration." *Id.* Whether a witness' testimony has been sufficiently corroborated is a matter entrusted to the jury as the trier of fact. *Id.*

■ The testimony of Whary supplied the plan, method and motive for the murder of George Urice. The record before us corroborates her testimony. The appellant, by his own admissions placed himself at the scene of the crime and helped cover-up the murder. Testimony established a financial

motive for the murder. The medical examiner concluded that the injuries to the victim's head were not consistent with a fall down carpeted stairs, as argued by the appellant. The victim's blood was found on the appellant's clothing. Finally, the testimony of the residents of the apartment complex corroborates Whary's testimony. We conclude that there was sufficient evidence to connect the appellant with the crime for which he was convicted.

### III. Testimony of the Appellant's Former Wife

The appellant next contends that the appellant's former wife was incompetent to testify as to matters coming to her knowledge through the marital relationship with the appellant.

■ Before 1993, the firmly established rule in Tennessee was that in criminal cases, neither husband nor wife were permitted to testify over objection as to any matter occurring between them by virtue or in consequence of the marital relation, nor as to any confidential communications between them. *See Crane & Co. v. Hall,* 141 Tenn. 556, 213 S.W. 414 (1919); *McCormick v. State,* 135 Tenn. 218, 186 S.W. 95 (1916). Under this rule, the non-testifying spouse could invoke the privilege. *See McCormick,* 186 S.W. at 97. However, in *State v. Hurley,* 876 S.W.2d 57 (Tenn.1993), the Tennessee Supreme Court modified the spousal privilege. In *Hurley,* the court held that only the testifying spouse can invoke the privilege. 876 S.W.2d at 63–64.

■ The appellant contends that at the time of the offense in 1976, the appellant's spouse would not have been allowed to testify against the appellant over his objection. The appellant contends further that application of *Hurley* to allow the testimony in the 1994 trial amounts to an application of an *ex post facto* law, which is prohibited by both the United States and Tennessee Constitutions.[9] The State counters by arguing that application of *Hurley* did not violate constitutional prohibitions against *ex post facto* laws, and in

9. *See* U.S. CONST. art. I, § 10; TENN. CONST. art. 1 § 11.

the alternative, that the appellant waived the spousal privilege.

The Tennessee Supreme court has adopted five classifications of *ex post facto* laws under the Tennessee Constitution. The classifications are as follows:

1. A law which provides for the infliction of punishment upon a person for an act done which, when it was committed, was innocent;

2. A law which aggravates a crime or makes it greater than when it was committed;

3. A law that changes punishment or inflicts a greater punishment than the law annexed to the crime when it was committed;

4. A law that changes the rules of evidence and receives less or different testimony than was required at the time of the commission of the offense in order to convict the offender; and

5. Every law which, in relation to the offense or its consequences, alters the situation of a person to his disadvantage.

*State v. Pearson,* 858 S.W.2d 879, 882 (Tenn. 1993) (quoting *Miller v. State,* 584 S.W.2d 758, 761 (Tenn.1979)). These classifications were derived from decisions of the United States Supreme Court. *See Calder v. Bull,* 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798) (first four classifications); *Thompson v. Utah,* 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898) (fifth classification). The appellant contends that the application of *Hurley* to his 1994 trial falls within the fourth and fifth classifications.

The appellant cites no authority in support of his argument. Nor can we find any Tennessee case which decides the question of whether a law changing a rule of evidence to allow a witness, who was prohibited by previous law from testifying, to later testify against a defendant in a criminal proceeding. However, the United States Supreme Court has held on several occasions that laws which change a rule of evidence, but which do not increase the punishment nor change the elements of the offense or the ultimate facts necessary to establish guilt, but only remove existing restrictions on the competency of certain classes of evidence or of persons as witnesses do not constitute *ex post facto* laws. In *Hopt v. Utah,* 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884), the Supreme Court held that a Utah law which changed the previous rule that no convicted felon could testify in a criminal case was not an *ex post facto* law. Again, in *Thompson v. Missouri,* 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898), the Court held that a Missouri statute authorizing for the first time the comparison of disputed handwriting with any writing proved to be genuine was not an *ex post facto* law. *See also Thompson v. Utah,* 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898). The reasoning behind these cases was opined by the Court in *Beazell v. Ohio,* 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925), in which Justice Stone stated:

> Just what alterations of procedure will be held to be of sufficient moment to transgress the constitutional provision [against ex post facto laws] cannot be embraced within a formula or stated in a general proposition. The distinction is one of degree. But the constitutional provision was intended to secure substantial personal rights against arbitrary and oppressive legislation, and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance.

269 U.S. at 171, 46 S.Ct. at 69.

Thus it is clear that laws which change rules of procedure but which do not affect any substantial right of a defendant are not *ex post facto* laws. The *Hurley* rule establishing that only a witness spouse may invoke the spousal privilege in a criminal proceeding is a procedural rule that did not affect any substantial rights of the appellant. It did not take away an available defense. Nor did it change the elements of the offense or the ultimate facts necessary to establish guilt. Therefore, application of *Hurley* to allow the appellant's former wife to testify against him over his objection did not constitute a violation of the constitutional prohibition against *ex post facto* laws.

### IV. *Testimony of the Victim's Fear of the Appellant*

The victim's wife testified over the appellant's objection that the victim had ex-

pressed fear of the appellant. Specifically, she testified that the victim told her that he believed that the appellant was going to kill him for the insurance proceeds. After allowing the testimony, the trial court instructed the jury that this statement was only to be considered to show the victim's state of mind, and not the truthfulness of the statement. The appellant contends that admission of this testimony was error.

It is clear that the testimony objected to by the appellant was hearsay. Hearsay is inadmissible in Tennessee unless it falls within an enumerated exception. *See* Tenn. R.Evid. 802 and 803. Rule 803(3) of the Rules of Evidence establishes the so-called "state of mind" exception to the hearsay rule:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed. . . .

The State argues that the testimony in question falls within this exception. The appellant contends that the testimony is outside the exception's scope and that admission of the evidence deprived the appellant of his right of confrontation.

The applicable case law supports the proposition that the testimony in question was admissible under Rule 803(3). In *State v. Smith*, 868 S.W.2d 561, 573 (Tenn.1993), our supreme court ruled that a murder victim's statements expressing fear of the defendant were admissible under Rule 803(3). *See also State v. Cravens*, 764 S.W.2d 754, 755 (Tenn. 1989) (victim's statement, "[w]ell, I'm a dead man then, love and kisses to everyone," admissible to prove state of mind of victim).

However, the preliminary question is whether the victim's fear of the appellant was relevant. *See* Tenn.R.Evid. 401, 403. The appellant has not argued relevancy on appeal. However, since the appellant objected to the testimony, we find it necessary to address the relevancy issue as a matter of plain error. *See* Tenn.R.Crim.P. 52(b). In *Smith*, the defendant was accused of killing his wife and her sons. In ruling on the admissibility of the wife's expressed fear of the defendant, the supreme court held that "[while] the evidence was admissible to show the declarant's state of mind ... [such] state of mind was not directly probative on the issue of whether the defendant had murdered [the victims]." 868 S.W.2d at 573. In accord with *Smith*, we conclude that the victim's state of mind was not directly probative on the issue of whether the appellant murdered the victim.

The State argues that the evidence was probative to rebut the appellant's testimony that the victim sexually assaulted the appellant's wife and that the appellant and victim were friends. However, at the time the testimony of the victim's fear was admitted, these facts were not before the jury. Thus, the testimony could not be relevant for the purposes offered by the State. *See Smith*, 868 S.W.2d at 573. Moreover, even if the testimony was relevant on these issues, the danger of unfair prejudice as a result of its admission substantially outweighs its probative value. The evidence was therefore inadmissible.

■ Although admission of the testimony in question was error, it was harmless beyond a reasonable doubt. The appellant's former wife testified that the appellant had expressed plans to kill the victim for the insurance proceeds. Also, Phillip Smartt, the insurance agent, testified that the appellant's wife had called several times to inquire as to the delay in processing the victim's application. Therefore, there was ample evidence in the record to conclude that the appellant had planned to kill the victim in order to acquire the proceeds from the insurance policy. Accordingly, the admission of the testimony concerning the victim's fear of the appellant did not affect the result of the trial. *See* Tenn.R.Crim.P. 52(a).

## V. *Admission of the Appellant's Statement*

The appellant next contends that his statement given to police the night of November 22, 1976, regarding the events of that day, and which was read into the record at trial, was inadmissible. The appellant argues that at the time the statement was taken, he was

"seized" without probable cause, thereby rendering his statement inadmissible as the "fruit of an unlawful seizure."

The appellant filed a pretrial motion to suppress the statement. At the suppression hearing, the appellant testified that there were "a dozen or so" police officers at his office at different times on the evening Urice's body was discovered. He testified that one of the officers, Chief Davis, told him "that they were taking us down to the police services building to take formal taped statements." The appellant assented and replied that he would follow the police to the station in his car. According to the appellant, the police refused to let the appellant drive his own car, and Chief Davis told the appellant that he "would be going in [Chief Davis'] car." The appellant testified that due to the "tone of voice and the atmosphere in the office," he thought he would be arrested if he refused to go the station and make a statement. He also testified that no officer told him that he did not have to go to the station, and that he thought that he had to go. On cross-examination, the appellant admitted that at the first trial he had testified that "Chief Davis said he'd like for both of us to come downtown with him so he could take some formal statements from us ... I said that was fine." Once at the station, the police gave the appellant and his wife their *Miranda* rights, then proceeded to question them. The State presented no witnesses and made no argument at the suppression hearing. The trial court denied the motion to suppress without stating its reasons for the denial.

■■ The question before us is whether the appellant was "seized" within the meaning of the Fourth Amendment when he was taken to the police services building. Generally, a person is seized for Fourth Amendment purposes "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980).

Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person or citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Id.* (citations omitted). In the absence of some such evidence, we must find that no seizure has occurred. *See Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. In the case before us, the specific question is whether the appellant's consent to accompany the police officers to the police services building was voluntary or was the product of duress or coercion, express or implied. The answer to this question is to be determined by the totality of the circumstances, and the State has the burden of proving that the consent was voluntary. *Id.* at 557, 100 S.Ct. at 1878–1879.

■ We conclude that, in view of all of the circumstances, the appellant was not seized within the meaning of the Fourth Amendment. The appellant's testimony at the suppression hearing clearly indicated that he voluntarily agreed to accompany the police officers to the police services building. There were neither threats nor a show of force. Nor was there any physical compulsion to accompany the officers. The appellant did testify that Chief Davis' tone of voice indicated to the appellant that the trip to the station was mandatory. However, in view of all of the circumstances, the evidence of the voluntariness of the appellant's consent to accompany the officers outweighs this testimony. *See Mendenhall*, 446 U.S. at 557–558, 100 S.Ct. at 1878–1879; *cf. Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (forcible detention of defendant and transportation to police station for questioning constitutes seizure).

Since the appellant was not seized for Fourth Amendment purposes, his statement was admissible, and the trial court properly overruled the appellant's motion to suppress.

### VI. *Cross–Examination of the Appellant's Former Wife*

The appellant next contends that the trial court erred in limiting the cross-examination

of the appellant's former wife, Darleen Whary. Specifically, the appellant contends that he should have been allowed to elicit testimony from Whary concerning her escape from Department of Correction custody in 1982, and the State's failure to prosecute her for that escape. The appellant contends that this testimony would have established that Whary was biased in favor of the State. The trial court ruled that the evidence of Whary's escape was not relevant.

The trial court held a jury-out voir-dire examination of Whary to allow the appellant to make an offer of proof concerning the testimony in question. During the voir-dire, Whary testified that she began serving her sentence for second-degree murder in 1980. She was allowed to work outside the prison on a minimum security work detail. In October 1982, Whary left her work assignment in Nashville for the purpose of obtaining an abortion. She was administratively charged for the escape, but was never criminally prosecuted.

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn.R.Evid. 401. Even if evidence is relevant, however, it may be excluded by the trial court "if its probative value is substantially outweighed by the danger of unfair prejudice...." Tenn.R.Evid. 403. We must therefore determine the probative value, if any, of evidence of Whary's escape and the failure of the State to prosecute her for the escape and, if necessary, weigh this probative value against the danger of unfair prejudice that would have flowed from its introduction. In doing so, we must keep in mind that the scope of cross-examination is largely within the trial court's discretion, and that such discretion will not be disturbed absent a finding of abuse. *State v. Lewis,* 803 S.W.2d 260, 262 (Tenn.Crim.App.1990).

The appellant argues that the State was required by statute to prosecute Whary for her escape, and that failure to do so

constituted "favorable treatment," which created bias on Whary's part in favor of the State. We find no merit in this argument for several reasons.

First, the incident in question occurred more than eleven years before the appellant's trial. At the time of the appellant's 1994 trial, Whary's sentence had expired, and she had nothing to gain from the State by testifying.

Second, we are not persuaded that by failing to prosecute her for escape, the State gave Whary "favorable treatment." The appellant argues that inclusion of the word "shall" in the then-existing statute proscribing escape made indictment and prosecution for escape mandatory in all cases where an inmate escapes from the custody of the Department of Correction.[10] However, the decision of whether to prosecute lies entirely within the function of the executive branch of the government. *See Dearborne v. State,* 575 S.W.2d 259, 262 (Tenn.1978). The legislature can only proscribe and set punishment for certain conduct. Accordingly, although the escape statute provided that one guilty of escape "shall be indicted," the decision of whether to prosecute individual inmates accused of escape rests entirely within the discretion of the executive branch, through the district attorney general. Thus the statute did not make indictment and prosecution of all such inmates mandatory. In the case of Whary, the Department of Correction decided to impose administrative sanctions upon her instead of having her prosecuted for escape. The appellant has presented no evidence that Whary was treated any differently than any other inmate under similar circumstances.

Finally, the appellant has established no connection between the department, agency or individuals who chose not to prosecute her for escape and the special prosecutor for the appellant's trial or the Hamilton County District Attorney's office. We find it extremely unlikely that the Department of Correction gave Whary favorable treatment in exchange

---

10. Tenn.Code Ann. § 39–5–702 (repealed 1989) provided: "If any inmate serving a term under the direct or indirect custody or supervision of the department of correction ... shall escape or attempt to escape, he shall be indicted for escape...."

for testimony in a trial that would occur eleven years later and which they could in no way anticipate.

For all of these reasons, we conclude that Whary's escape and the State's subsequent decision not to prosecute her was not probative of any bias in favor of the State. We therefore conclude that the trial court did not err in excluding testimony concerning the escape.

## VII. *Opinion Testimony of the Hamilton County Medical Examiner*

■ The appellant contends that the trial court erred in permitting the former Hamilton County Medical Examiner, Dr. Beckmann, to give opinion testimony outside the area of his expertise. Specifically, the appellant argues that Dr. Beckmann should not have been allowed to testify regarding the cause of death and the nature of the victim's injuries. The basis of the appellant's argument is that Dr. Beckmann testified that he had no specialized training or education in the field of forensic medicine.

A witness does not have to be an expert to testify as to the cause of death. *Owens v. State,* 202 Tenn. 679, 308 S.W.2d 423, 424 (1957).[11] Moreover, Dr. Beckmann testified that during his tenure as medical examiner of Hamilton County from 1967–78, his office performed approximately fifty to sixty autopsies per year. His experience and medical training more than qualified Dr. Beckmann to testify as to the cause of death of the victim and the nature of his wounds. *See State v. Duncan,* 698 S.W.2d 63, 68 (Tenn. 1985) (general surgeon, who was not a forensic pathologist, could testify as to cause of death, but was not qualified to give his version of how the crime occurred). The issue is without merit.

## VIII. *Testimony of Dr. Sperry*

The appellant also contends that the trial court erred in limiting the testimony of Dr. Kris Sperry, a forensic pathologist called by the appellant to testify as to the cause of death and the nature of the victim's injuries.

### A

■ During a jury-out examination, the following question was posed to Dr. Sperry: "based on what you have seen in this case, can you opine to a reasonable medical certainty whether there was sufficient evidence to conclude that this death was a homicide?" The State objected, and the trial court sustained the objection, ruling that answering the question would "invade the province of the jury." The appellant now argues that the trial court erred in its ruling.

■ Rule 704 of the Tennessee Rules of Evidence states that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." The State concedes that the basis for the trial court's ruling was error. The State argues, however, that the testimony was properly excluded as "speculative," because Dr. Sperry testified that he could not state with medical certainty the cause of death. We disagree. The cause of death and whether the death was a homicide are two different things. Even though a witness is unable to testify as to the exact cause of death, it does not necessarily follow that the witness cannot testify as to whether the death was a homicide. Although excluding the testimony in question was error, it was harmless beyond a reasonable doubt. The evidence in this case left no doubt that the death of Urice was a homicide.

### B

■ During cross and redirect examination of Dr. Sperry, the following exchange occurred:

Q. Yes, sir. You said at the beginning you do an autopsy to determine cause of death and manner of death.

A. Yes.

Q. But you got no idea, sir, what caused his death or how he died, do you, sir?

A. Oh, I have ideas as to what caused—

---

11. In *Owens,* the Supreme Court of Tennessee held that it was not error to allow an embalmer with twenty years experience to testify as to the cause of death of the decedent. 308 S.W.2d at 424.

Q. You testified you cannot do it with what's been given to you. Isn't that what your testimony was?

A. Correct, based upon—

Q. Thank you, sir.

*Redirect Examination:*

*By Mr. Herbison*

Q. Dr. Sperry, tell us what those ideas are.

At this point, the State objected. The trial court sustained the objection. The appellant now contends that the State "opened the door" in its cross-examination of Dr. Sperry.

 Rule 702 of the Tennessee Rules of Evidence provides:

> If scientific, technical or other specialized knowledge will *substantially assist the trier of fact* to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise.

(emphasis added). In the instant case, the trial court was confronted with the question "tell us what those ideas are." Mere "ideas" do not rise to the level of evidence and would not have substantially assisted the jury in determining the cause of death. Therefore, the trial court did not err in refusing to allow Dr. Sperry to answer the question.[12] Furthermore, we conclude that the State did not "open the door" in its cross-examination of Dr. Sperry.

### IX. *Admission of the Appellant's Book*

 Finally, the appellant contends that the trial court erred in ordering portions of the appellant's book, *Beyond Prison Walls,* the *Jeris Bragan Story,* redacted before being viewed by the jury. The State and the appellant entered into a pretrial stipulation whereby "a copy of Mr. Bragan's book ... or excerpts from the same, may be introduced as substantive evidence at the trial." When the appellant sought to have the book introduced at trial, the trial court, ordered that certain portions of the book relating to evidence deemed inadmissible by the trial court during the course of the trial be excised before the book was submitted to the jury.

 The appellant contends that the order to have portions of the book excised was error. In support of this argument, the appellant cites two cases which stand for the proposition that stipulations should be rigidly enforced by the courts. *See State ex. rel. Weldon v. Thomason,* 142 Tenn. 527, 221 S.W. 491, 495 (1920); *State v. Ford,* 725 S.W.2d 689, 691 (Tenn.Crim.App.1986), *perm. to appeal denied* (Tenn.1987). However, the appellant ignores relevant authority that holds that stipulations are unenforceable when they are inappropriate. *See State v. Burrow,* 769 S.W.2d 510, 512 (Tenn.Crim. App.1989); *State v. Land,* 681 S.W.2d 589, 592 (Tenn.Crim.App.1984). In the instant case, the trial court properly excluded portions of the book that had been previously ruled irrelevant or otherwise inadmissible.

The judgment of the trial court is affirmed.

SUMMERS and TIPTON, JJ., concur.

---

12. At the motion for new trial, the following affidavit was tendered on behalf of the witness Sperry purporting to state how he would have answered the question had the court permitted further testimony:

> [B]ased upon the fact that the decedent was found at the bottom of a flight of stairs, coupled with the cerebral edema evident in the brain, makes it far more probable that Mr. Urice sustained a neck fracture during the course of a fall down the stairs, and died an asphyxial death brought about by paralysis of the respiratory (breathing) muscles caused by a broken neck. However, ... it is not possible for me to state unequivocally that this must be the cause of death.

This testimony, which is based upon a reasonable medical analysis, may have been admissible under Rule 702. However, the appellant did not make an offer of proof at trial. Moreover, we note that on two separate occasions Dr. Sperry testified that he was unable to offer an opinion based upon a reasonable degree of medical certainty as to the cause of Urice's death, due to an inadequate autopsy by the county medical examiner. We, therefore, examine the trial court's ruling from the testimony and facts that were before the court contemporaneous with its ruling.