IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

FEBRUARY 1997 SESSION



FILED

December 10, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 03C01-9603-CC-00134 |
| | ) | |
| | ) | Blount County |
| v. | ) | |
| | ) | Honorable D. Kelly Thomas, Jr., Judge |
| | ) | |
| JUAN PEREZ, | ) | (Second degree murder) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

Robert M. Cohen
303 High Street
Maryville, TN 37804

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
       and
Timothy F. Behan
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0493

Michael L. Flynn
District Attorney General
       and
Edward P. Bailey, Jr.
Assistant District Attorney General
363 High Street
Maryville, TN 37804

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

**O P I N I O N**

The defendant, Juan Perez, appeals as of right from his conviction following a jury trial in the Blount County Circuit Court for second degree murder, a Class A felony. As a Range I, standard offender, the defendant was sentenced to twenty-two years in the custody of the Department of Correction, and he was fined twenty-five thousand dollars. On appeal, the defendant contends that:

> (1) the evidence is insufficient to support his conviction;
>
> (2) the trial court erred by denying his motion to suppress the defendant's statement he gave to police;
>
> (3) the trial court erred by allowing the state to introduce two photographs of the victim;
>
> (4) the trial court erred by refusing to allow the testimony of Barry Rice, a defense witness;
>
> (5) the trial court erred by refusing to grant a new trial because the defendant was unfairly prejudiced during his cross-examination by the state;
>
> (6) the trial court erred by refusing to grant a new trial based on newly discovered evidence; and
>
> (7) the trial court erred by applying enhancement factors and by not sentencing the defendant to a sentence within the lower part of Range I.

We affirm the judgment of conviction.

On March 19, 1994, Grant Spires, Gayann Tucker and Elizabeth Lee discovered Kimberly Bauer, the estranged girlfriend of the defendant, lying on her side in the living room of her home. She had suffered numerous stab wounds to the chest and the upper left side of her body. The victim died later as a result of the stabbing.

Melissa Henry, a friend of the victim, testified that around 7:00 p.m. on the evening of the offense, she called the victim at Krystal Restaurant where the victim was working, and they planned to meet at 8:30 p.m. She stated that she drove by the

2

victim's house without stopping at about 7:30 p.m., and she saw the defendant's late-model Camaro parked at the victim's house.  She said that she returned around 8:30 or 8:45 p.m. and saw police cars and an ambulance.  On cross-examination, she denied that she told anyone that she saw a dark-colored car or an Impala.  She also denied telling Officer Lowell Ridings that she had seen the defendant wear a knife on his belt on earlier occasions.

Sharon Fields, an assistant manager at Krystal Restaurant, testified that the victim logged out at 7:13 p.m.  She stated that she saw the victim leave work at about 7:15 p.m.  Audie Holloway, a coworker of the victim, testified that she worked with the victim on the night of the offense.  She said that the victim received two or three telephone calls, one around 2:00 or 3:00 p.m. and the others shortly before the victim left work.  She stated that two calls were from an unidentified man.  She testified that the victim was very upset when she talked to the man and appeared to be in a hurry to leave.  She stated that the victim left the restaurant at about 7:15 p.m., appearing distracted.  Another coworker testified that the victim received a call around lunchtime from an unidentified man, and she said that the victim spoke very fast on the telephone.

The victim's mother testified that the victim called her at about 7:30 p.m.  Thelma Martin, the victim's neighbor, testified that she saw the victim come home around 7:30 p.m.  She said that the defendant drove up shortly afterwards and parked his car in the road.  She stated that she recognized the defendant's car because of its loud muffler and its multi-colored paint.  She said that she saw the defendant get out of the car.  She testified that the defendant left about ten minutes later, squealing the tires as he left.  Ms. Martin testified that she was not aware of anyone being at the victim's house before the defendant arrived.  On cross-examination, Ms. Martin stated that it was not uncommon for the defendant to be at the victim's house.

3

Morris Keaton, a neighbor of the victim, testified that he saw a black car arrive at the victim's house before the victim came home around 7:30 p.m. He said that he heard two women's voices. He stated that after the black car left, the victim arrived, and the defendant arrived shortly afterwards. He said that after about fifteen minutes, the defendant drove away quickly. On cross-examination, Mr. Keaton admitted that he was unsure whether the black car arrived before or after the victim came home. He stated that the defendant arrived after the black car.

Gayann Tucker, a friend of the victim and an acquaintance of the defendant, testified that the victim had stopped dating the defendant and had begun dating Grant Spires. She said that two days before the offense, while she, Spires, and Elizabeth Lee were at the victim's house, the defendant arrived unexpectedly in his car. Ms. Tucker stated that two weeks earlier, she had told the defendant that Spires was her boyfriend in order to avoid any conflict with the defendant. She testified that the defendant put his arm around her, told her that he knew that the victim was dating Spires, and threatened to kill the victim if she continued to see him. She believed that the defendant was serious.

Tucker, Spires and Lee testified that they planned to meet the victim after she came home from work. They said that the victim had told them not to come until 8:00 p.m. because the victim was going to have the defendant over to her house to talk to him. Lee and Spires testified that they drove by the victim's house around 7:40 p.m. and saw the defendant's car parked at the house. They arrived at the victim's house around 8:05 or 8:15 p.m. They stated that the victim's car was the only one in the driveway. Tucker knocked on the door, and the door opened, revealing the victim lying in a fetal position on her left side in the living room with her head slightly under the coffee table. A lot of blood surrounded the victim. Tucker called 9-1-1. Following the 9-1-1 operator's instructions, Spires turned the victim over, removed her shirt and bra,

4

and began performing CPR.  Spires said that the victim was bleeding slightly and had a faint pulse.

Officer Larry Kauker of the Alcoa Police Department testified that the victim was dead when he arrived and that Grant Spires was standing near the door of the victim's house.  Sergeant Dale Boring of the Alcoa Police Department testified that he found the victim lying on her back with her shirt torn open and her bra cut.  He said that the victim had numerous stab wounds to the chest area, and he stated that there was no sign of a struggle.  He stated that a couple of butcher knives were found in the kitchen area, but none of the knives appeared to have blood on them.  Sergeant Boring testified that he later went to the defendant's house, but the defendant was not at home.  He said that he then obtained a search warrant to search the defendant's house.  He stated that a search of the house did not reveal any evidence.  Sergeant Boring testified that he later learned that the defendant had surrendered to the police, and he met Detective Ridings to conduct an interview of the defendant.  He stated that the defendant gave inconsistent statements, first telling them that he had visited the victim and that she was alive when he left and then telling them that he discovered the victim injured when he arrived.

Gary Hamilton, a crime scene technician for the Blount County Sheriff's Department, testified that the only identifiable prints he found at the victim's house were from the victim and Gayann Tucker.  He said that there were no signs of a struggle.  He stated that an examination of the victim's hands did not reveal any hair or skin underneath her nails.  He testified that he examined the defendant's car but found no blood, knives, or bloody clothing inside the car.  He said that he did not use Luminol to detect the presence of blood because it destroys other potential evidence.  On cross-examination, he stated that an examination of the defendant's hands revealed no cuts.  He conceded that given the nature of the crime, it was probable that blood would have

5

been on the perpetrator's shoes, clothing or hands. He acknowledged that it was possible to send parts of the car to the Tennessee Bureau of Investigation Crime Lab in Nashville for a more thorough examination.

Dr. William Elliot, a pathologist, testified that he conducted an autopsy of the victim. He stated that the victim suffered multiple stab wounds measuring between six and eight inches in depth. He stated that eleven stab wounds were to the left side of the breast and extended from above the breast to the rib area. Dr. Elliot testified that the victim also suffered twelve stab wounds to the left side extending from the lower part of the shoulder blade to the hip. The victim had five stab wounds to the left arm along with four superficial wounds. Dr. Elliot stated that the victim also had defensive wounds on her hands. He said that the victim could have died as a result of one stab wound to a large vein in the neck and another that severed the covering of the heart. He stated that the victim's death could also have been caused by three stab wounds that perforated the victim's lung, causing the collapse of the lung. He believed that the victim was conscious during most of the attack, stating that the wounds would not have caused a rapid death. Dr. Elliot testified that the wounds would have been painful. On cross-examination, Dr. Elliot testified that it was possible but not likely to feel a pulse forty-five to fifty minutes after the stabbing. He said that the victim most likely died as a result of the cut vein but that the other wounds were potentially fatal.

Agent Samera Zavaro of the Tennessee Bureau of Investigation testified that he tested a towel found in the victim's bathroom for the presence of blood and found none. He said that he also found no blood on the knives taken from the victim's kitchen. He stated that swabbings of the defendant's car showed no presence of blood or human tissue. He testified that he also found no blood on the defendant's clothing. Agent Zavaro testified that a washcloth taken from the victim's sink revealed the presence of blood. On cross-examination, he testified that the Tennessee Bureau of

6

Investigation could examine an entire car, a preferred procedure, although it was not uncommon to use swabbings.

Margaret Bash, a forensic scientist for the Tennessee Bureau of Investigation, testified that DNA testing of the washcloth containing blood was unsuccessful in determining the source of the blood. She said that testing of the victim's clothing reflected that the blood came from a single source, the victim.

Kenneth McKee testified that he was in jail in 1994 and that he was a cellmate of the defendant. He said that a few days after the defendant arrived, the defendant talked to him a couple of times about the offense. He said that the defendant told him contradictory statements regarding when he arrived at the victim's house, initially stating that he arrived between 7:05 and 7:15 p.m. and later stating that he arrived at 8:00 p.m. McKee testified that the defendant told him that he and the victim argued over a truck that belonged to the victim's parents because the defendant had wrecked the truck and the victim's parents were being sued. The defendant said that he had been drinking earlier and had planned to go to a bar. McKee stated that the defendant told him that he had blacked out during the argument and that the next thing he remembered was standing over the victim's body which was curled in a fetal position. The defendant said that he touched the victim's hair and forehead. The defendant also told McKee that he became scared, went to the bathroom to urinate, and then left in his car. The defendant told McKee that he surrendered to the police the next day because he believed that it would look less suspicious.

On cross-examination, McKee admitted that he was allowed work release and was sent for drug and alcohol treatment, but he denied that the release was related to giving information to the police. He also admitted that he did not report back to jail when released, resulting in felony escape charges. He denied that the felony escape

charges were dismissed because he agreed to testify against the defendant. He said that the charges were dismissed because he entered guilty pleas to four counts of violating the Habitual Motor Vehicle Offender statute. He said that he was not promised anything in exchange for his testimony against the defendant. Another prisoner who was incarcerated with the defendant testified similarly regarding the defendant's statements about the offense.

Officer Lowell Ridings testified that he went to the victim's house at about 8:45 or 9:00 p.m. He stated that he took three kitchen utility knives located near the kitchen sink. He testified that dirty dishes were in the sink but that he did not see any blood. He said that he interviewed Gayann Tucker, Elizabeth Lee and Grant Spires, and based on the information he received, he looked for the defendant at his home. Officer Ridings testified that he obtained an arrest warrant for the defendant, but he learned the following day that the defendant had surrendered to the police. He stated that he interviewed the defendant and tape-recorded the questioning, which lasted about one hour and fifty minutes.

A redacted tape of the interview was played for the jury. The defendant initially told police that he arrived at the victim's house at about 7:40 p.m. The defendant said that he and the victim talked and smoked a marijuana cigarette. He stated that he left after about ten or fifteen minutes and that the victim was alive and well when he left. He said that he went to the house of Frank Courier, his friend and coworker, after leaving the victim's house. After further questioning, the defendant told the police that when he arrived at the victim's house, he found the victim injured. He said that he had lied about talking to the victim and smoking a marijuana cigarette with her.

8

Officer Ridings testified that he drove from the defendant's house to the victim's house and stated that it took eighteen minutes and fifty-seven seconds driving about fifty-five miles per hour in normal traffic. He said that it took around ten minutes to drive from the victim's house to the house of Frank Courier. On cross-examination, Officer Ridings testified that a thermometer was placed under the armpit of the victim at about 9:00 or 9:10 p.m, revealing a temperature of 98.8. He conceded that he did not order the defendant's car to be sent to the crime lab in Nashville, explaining that no bloody footprints were found inside the car. He also admitted that he chose not to use other investigative means to determine the presence of blood. He said that when he interviewed Melissa Henry, she told him that the defendant wore a knife on his belt on several occasions.

Frank Courier, a coworker and friend of the defendant, testified that he had never seen the defendant wear a knife on his belt. He stated that their job required them to cut wrapping off pallets. He said that they generally used a paring knife with a two and one-half inch blade. He stated that the victim called the defendant at work and that he had never heard the defendant say anything mean to the victim. Mr. Courier testified that on the night of the offense, the defendant arrived unexpectedly at his house at about 8:30 or 8:45 p.m. and stayed the night. He said that the defendant did not have blood on his clothing. On cross-examination, Mr. Courier conceded that it was unusual for the defendant to spend the night. He stated that he had not seen the defendant earlier in the day. He said that the defendant did not appear to have been drinking and that the defendant was not nervous, upset or crying. Mr. Courier testified that the defendant did not mention the victim.

Other coworkers of the defendant testified that the defendant ordinarily wore jogging pants and that when the defendant wore jeans, he did not wear a belt. They said that the defendant never carried a knife with him at work, usually borrowing a

9

paring knife from someone else. The coworkers stated that they saw the defendant and the victim together during the week before the offense and on other occasions, and they appeared to be in love. One coworker stated that the defendant was a strong man.

The defendant testified that most people called him John. He stated that he met the victim in Wichita, Kansas, in 1989. He said that he and the victim lived together periodically at different locations. He testified that after the victim's parents moved to Maryville, he and the victim moved to the area and rented a house together. The defendant stated that around Thanksgiving in 1993, the victim moved out of the house and moved to her parents' house. He said that about two or three weeks later, the victim came by his house and gave him her new address and telephone number. He stated that he occasionally spent the night with the victim, and the victim occasionally spent the night with him. He said he considered the victim to be his girlfriend.

The defendant testified that he had a torn groin muscle at the time of the offense. He said that around 5:30 p.m. on the day of the offense, he called the victim at work regarding money he owed her, and they planned to meet at the victim's house around 8:00 p.m. He said the victim told him that she had plans with Grant Spires and some other friends later that evening. He stated that he left his house at about 7:25 or 7:30 p.m., arriving at the victim's house around 7:40 or 7:45 p.m. He testified that the door to the victim's house was partly open. The defendant said that he walked inside and that the house was not well lit except for a light in the bedroom and bathroom. He stated that he went to the victim's bedroom and bathroom to look for the victim. The defendant testified that when he returned to the living room, he discovered the victim lying on her side in a fetal position in a pool of blood. He said the victim was underneath the coffee table. He testified that the victim was no longer bleeding. He

stated he went to the bathroom and urinated and vomited. He said he rubbed his hands over the victim's forehead and across her hair, but the victim did not respond. He said he then sat on the couch and cried for a couple of minutes. The defendant testified that he stayed about ten minutes before leaving the house.

The defendant testified that after leaving the victim's house, he stopped at a gas station, purchased gas and a drink, and then started to call for help but could not because he was very weak. He stated that instead, he went to Frank Courier's house, arriving around 8:30 p.m., and stayed the night. He said that his mental condition was not good and that he was not himself, but he conceded that he did not tell Courier or Tim Vann, who was at Courier's house, about what he had found. The defendant testified that he went home around 8:00 or 8:30 p.m. and found a search warrant and a note stating that the police wanted to interview him about the victim's death. He said that he called the police and was then taken to the jail for an interview. He explained that he gave two different versions of the facts to the police because he was scared and not involved in the murder.

The defendant denied stabbing and killing the victim. He conceded that he did not try to take the victim's pulse or determine the nature of her injuries. He also admitted that he did not call 9-1-1 or ask a neighbor for help, explaining that he was afraid. He said that he held his hand over the victim's mouth and nose but did not feel any air. He stated that he also did not see the victim's chest move.

On cross-examination, the defendant testified that during the interview with police, he made up a story, but he denied lying about not killing the victim. He said he lied when he told Detective Ridings that he had talked to the victim for about fifteen minutes and had smoked a marijuana cigarette with her. He conceded that he had told the police that he was telling the truth. He admitted that he had never stayed overnight

11

at Courier's house before, although he had stayed late. The defendant testified that he was about six feet three inches tall and weighed about two hundred and forty-five pounds, and the victim was about five feet three inches and weighed about one hundred and thirty-five pounds.

William Boddy, a private investigator, testified that he interviewed Morris Keaton regarding the two vehicles he observed at the victim's house. He said that Keaton told him that he saw a black car appearing to be a Firebird or a Camaro and that two people were in the car because he heard two car doors shut. Keaton told him that the black car stayed about ten minutes. Mr. Boddy testified that Keaton said that the second vehicle was a black Jeep Cherokee or Bronco.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his conviction for second degree murder. He argues that the state failed to prove his guilt beyond a reasonable doubt because it did not introduce any physical evidence directly linking the defendant to the murder. The defendant asserts that given the discrepancies in the record and the defendant's testimony, the evidence is insufficient. The defendant also contends that there is no proof that the killing was done knowingly as required by T.C.A. § 39-13-210(a)(1). The state responds that the defendant's guilt was proven beyond a reasonable doubt. We agree.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence, but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences

from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

For circumstantial evidence to constitute the sole basis for a conviction, the facts must be "so closely interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone." State v. Crawford, 225 Tenn. 478, 484, 470 S.W.2d 610, 613 (1971). The evidence must be both consistent with the defendant's guilt and inconsistent with the defendant's innocence, exclude all other reasonable theories except that of guilt, and establish the defendant's guilt so as to convince the mind beyond a reasonable doubt that he or she committed the crime. Patterson v. State, 4 Tenn. Crim. App. 657, 661, 475 S.W.2d 201, 203 (1971).

In the light most favorable to the state, the evidence shows that the defendant called the victim at work on the day of the offense. The victim was upset after receiving the phone calls. At about 7:15 p.m., the victim left work hurriedly. Shortly after the victim arrived at her home at 7:30 p.m., the defendant arrived. About ten minutes later, the defendant sped away from the house. Shortly after 8:00 p.m., the victim was found near death by her friends. Two days before the killing, the defendant told Gayann Tucker that he knew the victim was dating Grant Spires and threatened to kill the victim if she continued to date him. The defendant told two of his cellmates that on the night of the offense, he had gone to the victim's house. He defendant admitted that he argued with the victim regarding a truck the defendant had wrecked, and he said that he blacked out during the argument and was standing over the victim's body when he became conscious. We believe that this evidence satisfies the requirements for guilt based solely on circumstantial evidence. A rational juror could find the defendant guilty of second degree murder beyond a reasonable doubt.

## II. DENIAL OF MOTION TO SUPPRESS

13

The defendant asserts that the trial court erred by denying his motion to suppress the statement he gave to police. He argues that the statement should have been suppressed as the fruit of an illegal arrest because (1) the arrest warrant was issued without the requisite determination of probable cause by the issuing magistrate and (2) the arrest warrant was issued for a person other than the defendant. The state responds that the trial court properly denied the motion to suppress. We agree.

At the suppression hearing, the defendant testified that he occasionally signs his name "John Perez." The defendant identified his birth certificate reflecting that he was born on October 9, 1962. He said that on March 19, 1994, he returned home and discovered a warrant pinned to the door stating that the police had searched his home and wanted the defendant to contact them to answer a few questions. The defendant testified that he went to a gas station and called the police to come and take him for questioning. He said he was arrested when the police arrived and was taken to the county jail about 8:30 or 9:00 a.m. The defendant was then questioned at the police station around 3:00 p.m. for about an hour or an hour and a half. He said he was not shown a copy of the warrant until about ten days later. The defendant testified that he had never used the aliases "Johnny Victor Perez" or "Johnny V. Perez."

Officer Lowell Ridings testified that he obtained the arrest warrant for the defendant. The affidavit of complaint and the arrest warrant reflect that the name of the person to be arrested for criminal homicide of the victim is "Johnny Vicktor Perez AKA: JUAN PEREZ." The words "AKA: JUAN PEREZ" also appear beside the reference to "Johnny Vicktor Perez" on the back side of the warrant. The back side of the warrant reflects that "Johnny Vicktor Perez AKA: JUAN PEREZ" lived at "2204 Sanderson, Ave Knoxville - Tenn." Below the address is a blank for the driver's license number and the date of birth of the person for which the arrest warrant was issued. The back side of the warrant shows that each of the blanks were filled in, then marked out, and the

14

driver's license number "79474258" and the birthday "10/9/62" was written above the marked out numbers. A copy of the defendant's driver's license reflects that the name, address, and driver's license number provided on the back side of the warrant were those of the defendant. A copy of Johnny Vicktor Perez's driver's license was also introduced, reflecting a different driver's license number, different birth date, and the Knoxville address.

Officer Ridings testified that he initially filled out the warrant between 12:00 and 2:00 a.m. believing that the defendant used the name Johnny Perez with several middle names and initials, including "Vicktor," "Salazar," and "N," as a result of a criminal history check on the defendant and a check of a motor vehicle accident in which the defendant was involved. He stated that he later learned after talking to witnesses and checking the defendant's driver's license through NCIC records that the defendant's name was Juan Perez with a date of birth of October 9, 1962. Officer Ridings testified that some people called the defendant "John Perez" or "Johnny Perez," given the fact that Juan is Spanish for John. He stated that after learning that he had written the wrong name and birthday on the warrant, he marked out the birthday and wrote in "October 9, 1962" and wrote in "AKA JUAN PEREZ" beside each reference to "Johnny Vicktor Perez." He stated that he made all of the corrections personally before the warrant was issued by Judicial Commissioner George Allison. Officer Ridings testified that he swore to the correctness of the information contained in the affidavit. He said that he also verbally identified the witnesses that were interviewed pursuant to the investigation.

Officer Ridings testified that he was not sure whether he had both the defendant's driver's license and Johnny Vicktor Perez's address at the time he filled out the warrant. He could not explain why he did not redraft the warrant deleting the references to Johnny Vicktor Perez. On cross-examination, Officer Ridings admitted

that some of the officers may have looked for the defendant at the Knoxville address. He denied making any changes after the warrant was issued. He said that the warrant was intended for the defendant who was the boyfriend of the victim and had a birthday of October 9, 1962.

Judicial Commissioner George Allison testified that when he initially read the warrant, Officer Ridings had not signed the affidavit of complaint because Officer Ridings was still investigating the facts. He said that Officer Ridings made some changes to the warrant before he read it over a second time. He stated that Officer Ridings swore to the affidavit of complaint. He believed that Officer Ridings explained the circumstances surrounding the allegations. Judicial Commissioner Allison did not remember if Officer Ridings named the witnesses interviewed, but he said that he normally asked questions before signing an arrest warrant. Judicial Commissioner Allison said that Officer Ridings made the changes before he issued the arrest warrant. He believed the warrant was sufficient.

Officer Scott Johnson of the Blount County Sheriff's Department testified that he arrested the defendant at the gas station. He said that the arrest warrant was at the county jail when he arrived. He stated that he did not remember if any changes had been made to the arrest warrant when he filled out the officer's return portion of the arrest warrant. Tony Rayburn, a correctional officer for the Blount County Sheriff's Department, testified that he saw the arrest warrant at the county jail. He said that the defendant told him that his middle name was not Vicktor.

At the conclusion of the hearing, the trial court denied the defendant's motion to suppress based upon the alleged defects in the arrest warrant. It held that the corrections on the arrest warrant were made before the warrant was issued. It found that the warrant for "Johnny Vicktor Perez AKA JUAN PEREZ" referred to the

16

defendant because the driver's license number and birthday were that of the defendant. The trial court determined that the defendant was not arrested based on an arrest warrant issued for another person. The court also denied the defendant's motion to suppress on grounds that the arrest warrant was not issued based upon probable cause. It concluded that the judicial commissioner did not rely solely upon the conclusions of Officer Ridings. It stated that although the proof was not clear regarding the questions asked of Officer Ridings relative to the witnesses, the affidavit of complaint set forth that independent witnesses placed the defendant at the scene and one witness heard the defendant threaten to kill the victim. It also found that the names of the witnesses were orally revealed to the judicial commissioner.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). The application of the law to the facts as determined by the trial court is a question of law which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

First, the defendant argues that the arrest warrant was not based upon probable cause, and therefore, the statement he gave following his arrest should be suppressed as fruit of an illegal arrest. He argues that the affidavit of complaint was based upon hearsay and did not provide the basis for the credibility of the informant who gave the information used for the arrest warrant as required by the Advisory Committee Comments to Rule 3, Tenn. R. Crim. P. He also asserts that the trial court did not properly examine Officer Ridings under oath to determine the reliability of the hearsay evidence given by the informant.

Rule 4(a), Tenn. R. Crim. P., provides in pertinent part:

17

ISSUANCE. If it appears from the affidavit of complaint or supporting affidavits filed with the affidavit of complaint that there is probable cause to believe that an offense has been committed and that the defendant has committed it, a warrant for the arrest of the defendant shall be issued by the magistrate or clerk to any officer authorized by law to execute it . . . . Before ruling on a request for a warrant, the magistrate or clerk may examine under oath the complainant and any witnesses the complainant may produce.

Probable cause must be "based upon evidence, which may be hearsay in whole or in part provided there is a substantial basis for believing the source of the hearsay to be credible and for believing that there is a factual basis for the information furnished." Tenn. R. Crim. P. 4(b). The probable cause determination for Rule 4(b) is the same as that necessary for a determination that probable cause exists for a warrantless arrest and for a search warrant. State v. Tays, 836 S.W.2d 596, 600 (Tenn. Crim. App. 1992). The probable cause requirement under Rule 4(b) essentially encompasses the Aguilar-Spinelli two-pronged test adopted by our supreme court in State v. Jacumin. Id.

Initially, we address the defendant's contention that the affidavit of complaint based upon hearsay must show the informant's basis of knowledge and the credibility of the information provided. The state notes that the defendant has provided no law that requires that probable cause must be provided in the affidavit and asserts that the magistrate could rely on what he was told by Officer Ridings. However, we conclude that the probable cause must exist within the affidavit(s) of complaint before an arrest warrant may issue. Rule 3, Tenn. R. Crim. P., defines an affidavit of complaint as "a written statement alleging that a person has committed an offense and alleging the essential facts constituting the offense charged." The Advisory Commission Comments to Rule 3 state the following:

It must be emphasized that before a valid arrest warrant can issue, the judicial officer issuing the warrant must be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant. Whiteley v. Warden, 401 U.S. 560 (1971). A factually sufficient basis for the probable cause judgment must appear within the affidavit of the complaint. If hearsay evidence is relied upon, the basis for the credibility of both the informant and the informant's

18

information must also appear in the affidavit. <u>Spinelli v. U.S.</u>, 393 U.S. 410 (1969).

Also, any evidence the magistrate obtains by examination of a witness must be reduced to writing and signed by the witness. <u>See</u> T.C.A. §§ 40-6-203 and -204. In this respect, issuance of the arrest warrant must be based upon probable cause as established in the written examination conducted by the magistrate. <u>See</u> T.C.A. § 40-6-205. Thus, an arrest warrant can only be validly issued upon probable cause being shown by written affidavit pursuant to Rule 4 and T.C.A. §§ 40-6-203 through 205.

In material part, the affidavit provides the following, with the underlying text being the portion handwritten by Officer Ridings and the remaining portion being a printed form:

> Personally appeared before me, the undersigned Judge of the Court of General Sessions of Blount County, Tennessee, the undersigned affiant, and made oath in due form of law, that on or about <u>March 19</u>[,] 19<u>94</u>, the offense of <u>criminal homicide: T.C.A. - 39-13-201 to wit: on March 19, 1994</u>[,] <u>Mr. Johnny Vicktor Perez AKA: JUAN PEREZ did go to a residence located at 107 Belfore Circle, where with premeditation, did deliberately and unlawfully kill Ms. Kimberly Jean Bauer by stabbing her to death. Information pursuant to all the above was obtained by witness who verified the suspect was at the scene at the approximate time of death and had made statements to the affect he (PEREZ) was going to kill Ms. Bauer. All of the above occurred in the City of Alcoa, County of Blount, State of Tennessee</u> has been committed in the State and County aforesaid and charging <u>Johnny Vicktor Perez AKA: JUAN PEREZ</u> thereof.

The defendant contends that neither the informant nor the informant's information are shown by the affidavit to be reliable. The state responds that because the statements were made by "witnesses, not informants," they should be deemed reliable. Citizens who witness crimes or relevant events are presumed to be reliable for probable cause purposes. <u>See</u> <u>State v. Melson</u>, 638 S.W.2d 342, 354-56 (Tenn. 1982); <u>State v. Smith</u>, 867 S.W.2d 343, 346-48 (Tenn. Crim. App. 1993). We believe that the word "witness" as used in the affidavit reasonably means a person with personal knowledge -- whether by sight, hearing, or other experience -- of the events recounted

19

in the affidavit. This also leads to a rational inference that the source of Officer Ridings' information was a bystander. Obviously, the affidavit of complaint could have been more detailed, but we believe that it provided probable cause to arrest the defendant.

Second, the defendant argues that the arrest warrant was issued for another person, rendering his subsequent arrest illegal and his statement to police inadmissible as fruit of the illegal arrest. In support of his argument, the defendant relies upon State v. Hughes, 31 Tenn. 261, 262 (1851), in which our supreme court held that the name of the defendant must be correctly stated in the indictment, otherwise it will be fatal. The state responds that the trial court correctly determined that the warrant was issued for the arrest of the defendant, given the fact that the arrest warrant contains the defendant's correct name, birthday and address. We agree. There is no merit to this issue.

### III. ADMISSION OF TWO PHOTOGRAPHS OF THE VICTIM

The defendant asserts that the trial court erred by admitting two photographs of the victim. He argues that the photographs should have been excluded because they had minimal probative value, and any probative value was substantially outweighed by the danger of unfair prejudice because the photographs were likely to inflame or mislead the jury. See Tenn. R. Evid. 401 and 403. The state responds that the trial court did not abuse its discretion by admitting the photographs during the cross-examination of the defendant. It argues that the photographs were particularly relevant to impeach the defendant's testimony that he did not see the victim when he walked inside the victim's house.

The leading case in Tennessee regarding the admissibility of photographs of murder victims is State v. Banks, 564 S.W.2d 947 (Tenn. 1978), in which our supreme court held that the determination of admissibility is within the discretion of the

trial court after considering the relevance, probative value and potential unfair prejudicial effect of such evidence. See Tenn. R. Evid. 403. The general rule, as stated in Banks, is that "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." Id. at 950-51. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." Id. at 951.

Thus, even relevant evidence should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. Id.; see also Tenn. R. Evid. 403. In Banks, the court stated, "The more gruesome the photographs, the more difficult it is to establish that their probative value and relevance outweigh their prejudicial effect." 564 S.W.2d at 951.

The state first introduced a black and white photograph of the victim, about eleven by thirteen and one-half inches in size. The photograph depicts the victim from her knees upward lying on her back in the middle of the living room floor. Only the lower right portion of the side of the victim's face is showing. The photograph reflects that the front of the victim's shirt and bra had been cut, revealing the victim's bare chest. Several towels are lying beside the victim on each side of her upper body. A coffee table is above the victim's head directly in front of the window. It is not a closeup shot, and the black and white photograph has a dull quality.

The state also introduced a three and one-half by five inch color photograph of the victim lying in the same position, but the photograph is taken from a different angle, showing the entire body of the victim. Most of the victim's face is showing. Blood is on the victim's bra and shirt, and a large blood spot and several

21

smaller blood spots are on the carpet to the left of the victim's body and in front of the coffee table. The photograph is a relatively close shot.

The black and white photograph was initially introduced during the testimony of Officer Kauker to show what he observed on the night of the offense. It was shown to the jury during the cross-examination of the defendant following the defendant's testimony regarding the location of the victim when he walked into the house on the night of the offense. The defendant claimed that he did not see the victim when he first entered the house because most of the victim's body was underneath the coffee table. He said that the victim was curled on her side in a fetal position with the blood spot in front of the victim. On redirect examination, the defendant said that the diagram of the scene contained a discrepancy in that the large blood spot was directly in front of the coffee table. On recross-examination, the state sought to introduce the color photograph to show the location of the large blood spot and to show that the victim could not have been under the coffee table given the size of the coffee table. The trial court agreed that the photograph was probative for such purposes and allowed its admission.

Initially, we note that the admitted photograph depicted the victim in a different position than when she was discovered. This factor weighs against admissibility. See Banks, 564 S.W.2d at 951. In the present case, the location of the victim's body was material given the defendant's testimony that he was unable to see the victim when he initially walked into the house because most of her body was underneath the coffee table. Although not depicted in the same location as when discovered, the photographs show the victim's body in relation to the coffee table. We believe that the photographs are relevant because they show that given the size of the coffee table, it was unlikely that the victim's body was in the location asserted by the defendant. Although the color photograph is more gruesome than the black and white

22

photograph, the color depicts better the location of the large blood spot. The trial court excluded other photographs that were more gruesome and graphic in nature. In our review, we are unable to conclude that the photographs' probative value was substantially outweighed by the risk of unfair prejudice. See Tenn. R. Evid. 403. Given the trial court's full consideration of this issue, we conclude that it exercised due discretion in admitting the photographs.

## IV. DENIAL OF TESTIMONY OF BARRY RICE

The defendant contends that the trial court erred by refusing to allow Barry Rice to testify to statements made by Morris Keaton that a black car with at least two occupants was at the victim's house for about ten minutes, not a minute and a half as Keaton testified to on direct examination. He argues that Rice's testimony was admissible as extrinsic evidence of Keaton's prior inconsistent statement. See Tenn. R. Evid. 613(b). He asserts that the trial court erred by determining that the evidence was not admissible because Keaton was not given an opportunity to explain or deny the statement. The defendant contends that Rule 613(b) does not require that the witness explain or deny the prior inconsistent statement before extrinsic evidence of the statement may be offered, arguing that Mr. Keaton could have been recalled by the state. See N. Cohen et al., Tennessee Law of Evidence § 613.4, at 412 (3d ed. 1995). The state responds that the testimony was properly excluded because Keaton was not given the opportunity to explain or deny the statement made to Rice. We agree.

During direct examination, Keaton testified that before the victim came home, a black car with at least two female passengers arrived, knocked on the victim's door, returned to the car about a minute and one-half later, and left. On cross-examination, Keaton was asked if he had earlier told defense counsel or William Boddy whether he had said that the black car had stayed at the house about ten minutes. Keaton answered that he had not made the statement, and he also said that he did not

23

tell anyone that the car left the house after ten minutes, asserting that the car stayed only a minute and a half. Keaton was excused after his testimony. The defendant presented the testimony of William Boddy that Keaton had told him that the car remained for ten minutes. When the defendant tried to present similar testimony from Barry Rice, the state objected on the grounds that Keaton had not been afforded the opportunity to explain or deny the statement to Rice. The trial court sustained the objection.

The defendant argues that Rice's testimony should have been admitted as extrinsic evidence of Keaton's prior inconsistent statement under Rule 613(b), Tenn. R. Evid., which states:

> **Extrinsic Evidence of Prior Inconsistent Statement of Witness.** Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 803(1.2).

Recently, our supreme court ruled that extrinsic evidence is inadmissible under Rule 613(b) unless (1) the witness is asked whether the witness made the prior inconsistent statement and (2) the witness denies or equivocates as to having made the prior inconsistent statement. State v. Martin, 964 S.W.2d 564, 565, 567 (Tenn. 1998). However, Rule 613(b) permits the trial court to depart from the foundational requirements when "the interests of justice otherwise require." Id. at 568.

In Martin, the witness, the defendant's girlfriend, testified that the defendant was with her at their apartment at the time of the robbery in issue. Id. at 566. On cross-examination, the witness admitted speaking to an officer shortly after the robbery, and she said that she did not tell the officer that the defendant was with her when the robbery occurred. Id. On rebuttal, the state called the officer who testified that when told the date of the robbery, the witness said to the defendant, "I don't know

24

where you were, I was in the motel." Id. Because the extrinsic evidence of the prior inconsistent statement was introduced without first asking the witness whether she had made the statement to the defendant or to anyone else, the supreme court held that the extrinsic evidence should not have been admitted. Id. at 568.

In discussing the proper foundation for admission of extrinsic evidence of a prior inconsistent statement, the supreme court cited with approval the procedures traditionally used in Tennessee before the implementation of Rule 613:

> This practice required that a witness' attention be drawn to the place, persons present, time of the statement, and to the substance of the statement before extrinsic evidence of the prior inconsistent statement could be used to impeach the witness' credibility. The foundational requirements were to: (1) provide the witness an opportunity to admit, deny, or explain the prior inconsistent statement; (2) refresh the witness' memory; and (3) allow the witness to respond intelligently to the impeachment attempt.

Id. at 567 (citations omitted). We believe that these requirements must be met for the admission of extrinsic evidence of a prior inconsistent statement of a witness under Rule 613(b).

Applying these standards to the present case, we hold that the trial court properly excluded Rice's testimony. Keaton was not afforded an opportunity to explain or deny the statement to Rice before the defendant sought to admit the extrinsic evidence of the statement through the testimony of Rice. We acknowledge that when questioned about the prior statements to defense counsel and Boddy, Keaton testified that he not only did not make the statements to them but also did not make the statements to anyone else. However, Keaton's attention was never drawn to the place, persons present, time of the statement, and the substance of the prior statement to Rice. Accordingly, Keaton was not provided an opportunity to admit or deny the statement. Also, the case before us is not an extraordinary case warranting the

25

flexibility to deal with the strict requirements of Rule 613(b).  Therefore, Rice's testimony was properly excluded.

## V.  CROSS-EXAMINATION OF THE DEFENDANT

The defendant asserts that he is entitled to a new trial on the basis that he was unfairly prejudiced during the cross-examination.  He argues that the trial court severely admonished him in front of the jury.  He argues that he was "improperly baited by the State's attorney and should not have been admonished so severely by the trial court, especially when the trial court could not see what the State's attorney (through his gestures) was asking the defendant."  He asserts that the trial court's frustration with and hostility towards him deprived him of a fair trial as required by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and the Tennessee Constitution.  The state responds that the defendant has waived the issue by failing to cite any authority in support of the position.  See T.R.A.P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).  It argues that in any event, the trial court acted within its discretion in controlling the conduct of the trial, and it did not abuse its discretion by ordering the defendant to answer the prosecutor's questions.  It also argues that any error was harmless given the briefness of the admonishment during the lengthy trial.  See T.R.A.P. 36(b); Tenn. R. Crim. P. 52(a).

Failure to cite to authorities in support of an issue constitutes a waiver of the issue.  Tenn. Ct. Crim. App. R. 10(b).  The defendant's brief cites no authority other than the general claim that the trial court's conduct violated his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I of the Tennessee Constitution.  We do not believe that the brief suffices regarding the need to cite authority.  In any event, we do not believe that the defendant is entitled to a new trial.

During direct examination, the defendant testified that he did not see the victim's body when he first walked into the house. The defendant was cross-examined about this testimony in an attempt to show that it was likely that the defendant would have seen the victim's body because it was in plain view. The prosecutor showed a photograph depicting the view of the victim's house when entering the house, and he asked the defendant to show the route he used to walk to the bedroom. When the defendant began to explain the reason for walking to the bedroom toward the light rather than explaining the direction he took to get to the bedroom, the prosecutor asked the defendant to answer the question by telling the jury where he went and told him he would then be given an opportunity to explain the reasons for his action. The defendant then responded, "In that direction." The prosecutor tried to clarify the direction the defendant took by asking specific questions. When the defendant did not respond to one of the questions asked, the trial court told the defendant to listen to the question and answer the question, and the defendant replied that he had answered the question. The trial court told the defendant to listen to him, but the defendant interrupted the court, resulting in the court admonishing the defendant not to interrupt the court.

The trial court then told the defendant:

This will help your testimony and it will help the Jury understand your testimony. And anything that you want to explain afterward, you can do that. And your lawyer is going to be given a chance to question you again.

The prosecutor asked the defendant whether he walked between a heater and the refrigerator, and the defendant responded by asking whether he would be allowed to explain after answering the question. The following colloquy took place:

[GENERAL BAILEY]: If you will answer the question, Mr. Perez.

THE COURT: Do you understand the question, Mr. Perez.

MR. COHEN: Your honor --

THE WITNESS: I understand the question, . . . what he doesn't comprehend is that the space is not as it's shown in that picture. The space --

MR. COHEN: Excuse me, your Honor, may I interrupt.

THE WITNESS: -- is a lot wider.

MR. COHEN: Mr. Perez, be quiet..

THE COURT: I want everybody to be quiet, including the lawyers and the witness. The question was did you walk between a refrigerator and a heater. That's a simple question.

THE WITNESS: Which I answered yes.

THE COURT: No, you didn't.

THE WITNESS: Yes, I did.

THE COURT: Don't argue with me. The first words out of your mouth was, can I explain something and what he doesn't comprehend. Now, ask the question again, please, and then when he's answered --

MR. COHEN: Your honor -- I'm sorry. I didn't mean to interrupt. I thought you were through.

THE COURT: When he answers the question, then if there is something about that question that needs to be explained, you can explain it. But just because you might want to explain something else doesn't mean you can go into a speech after a specific question has been asked. Now, do you understand that, Mr. Perez?

THE WITNESS: Yes, sir. I asked you if I could go --

THE COURT: Then you do it.

THE WITNESS: -- into an explanation after --

THE COURT: There was nothing that needed to be explained. If your lawyer wants to get up and start asking you about the distances from somewhere to somewhere else, then he can do that.

THE WITNESS: Well, isn't that what he just asked me?

THE COURT: No, sir. Ask the question again.

The defendant then objected on the ground that the prosecutor was using an ink pen to ask the question, causing the defendant to be confused because the

28

prosecutor was asking one question verbally and another question through his gestures. He said that the jury could see the gestures, although he did not explain the nature of the gestures. The judge stated that he could not see the gestures made by the prosecutor and overruled the objection.

At the hearing on the motion for new trial, the trial court stated that it admonished the defendant for two reasons: (1) to control the trial and (2) to prevent the defendant from talking over the prosecutor such that he alienated the jury. The court stated that it did not yell at the defendant. It also found that the admonishment did not have an effect on the jury.

A trial court has the inherent power to supervise and control its own court proceedings. Andrews v. Bible, 812 S.W.2d 284, 291 (Tenn. 1991); State v. Bragan, 920 S.W.2d 227, 239 (Tenn. Crim. App. 1995). The control and scope of cross-examination is within the sound discretion of the trial court. Reece v. State, 555 S.W.2d 733, 735 (Tenn. Crim. App. 1977). However, the trial court must take care not to convey to the jury an appearance of taking sides. See State v. Suttles, 767 S.W.2d 403, 407 (Tenn. 1989); State v. Brown, 823 S.W.2d 576, 588 (Tenn. Crim. App. 1991).

We hold that the trial court acted within its discretion. A review of the record, including the audio cassette tape recording of the defendant's cross-examination, reflects that the defendant did not first answer the question asked before trying to explain. The defendant interrupted the trial court on several occasions. We also note that defense counsel on one occasion had to tell the defendant to be quiet. The trial court had the authority to control the proceedings as it did.

## VI. NEWLY DISCOVERED EVIDENCE

29

The defendant claims that he is entitled to a new trial on the basis of newly discovered evidence that the victim was seen at a bar near her house on the night of the offense. He asserts that the evidence is material and would likely have resulted in a different outcome because it increases the possibility of the existence of other suspects, creating a reasonable doubt as to the defendant's guilt. The state responds that the trial court properly refused to order a new trial based on the newly discovered evidence. We agree.

At the hearing on the motion for new trial, the defendant presented testimony from two employees who worked for a bar located near the victim's house. The employees said that they remembered the victim coming into the bar on the evening of the offense. Both employees stated that they were not sure that they saw the victim on the night of the offense until another person told them. One employee said that the victim came into the bar about 4:30 or 5:00 p.m., ordered a beer, drank half of it, and then left. She said that the victim arrived and left alone. On cross-examination, she testified that the victim was not wearing a Krystal uniform, and she conceded that it could have been the day before the offense that she saw the victim in the bar.

Defense counsel's legal secretary testified that one of the employees who saw the victim at the bar was formerly her mother-in-law. She said that about one and a half to two weeks after the trial, she gave defense counsel both of the employees' names and one of the employees' addresses.

Barry Rice, a private investigator, testified that two to three weeks after the trial, defense counsel gave him one of the employees' addresses. He said that he interviewed the two employees. He testified that the employees told him that they saw

the victim in the bar on the night of the offense and that they remembered people talking about the victim's presence in the bar that night.

Officer Ridings testified that he measured the distance from the bar to the Krystal and from the bar to the victim's house. He stated that the distances were about the same, six tenths of a mile. He said that it took about seven minutes and two seconds to walk the distance between the locations.

The trial court denied a new trial on the basis of newly discovered evidence. It found that it was arguable whether the evidence would be harmful to the state or helpful to the defendant. It concluded that the defendant acted diligently in discovering the evidence after trial, although there was little to show that the defendant acted diligently before trial. The trial court determined that the evidence was not strong and that a new trial was not justified.

The decision to grant or deny a new trial on the basis of newly discovered evidence is a matter that rests in the sound discretion of the trial court. State v. Goswick, 656 S.W.2d 355, 358 (Tenn. 1983). However, a new trial is a matter of right when the defendant establishes (1) reasonable diligence in seeking newly discovered evidence, (2) materiality of the evidence, and (3) that the new evidence will likely change the result of the trial to one more favorable for the defendant. State v. Singleton, 853 S.W.2d 490, 496 (Tenn. 1993); Goswick, 656 S.W.2d at 359; Taylor v. State, 180 Tenn. 62, 67, 171 S.W.2d 403, 405 (1943).

In this case, the state does not contest the defendant's reasonable diligence in discovering the evidence. Rather, it argues that the evidence was neither material nor likely to produce a more favorable result for the defendant. Evidence is considered material if it would be likely to change the result. Evans v. State, 557

31

S.W.2d 927, 938 (Tenn. Crim. App. 1977). When newly discovered evidence merely tends to contradict or to impeach the trial evidence, a new trial is not always warranted. See State v. Sheffield, 676 S.W.2d 542, 544 (Tenn. 1984); State v. Lequire, 634 S.W.2d 608, 615 (Tenn. Crim. App. 1981). In other words, a new trial will not be granted when it appears that such newly discovered evidence merely discredits the testimony of a witness at the original trial, contradicts a witness' statements, or impeaches a witness, unless the testimony of the witness being impeached was so important to the issue and the evidence impeaching the witness so convincing that a different result must follow. Rosenthal v. State, 200 Tenn. 178, 186, 292 S.W.2d 1, 4-5 (1956).

The conviction in this case was based upon both direct and circumstantial evidence. During the trial, the defendant sought to establish the discrepancies in the time of events. The defendant alleged that the newly discovered evidence showed additional discrepancies, creating reasonable doubt as to his guilt. However, the evidence presented by the defendant was not certain either as to the time or the date that the victim was seen at the bar. Moreover, the employees testified that they remembered that the victim was in the bar on the night of the offense after talking to other people. Under these circumstances, the evidence is not strong that the victim was in fact in the bar before the offense took place. As a result, we cannot say that the new evidence would likely change the result of the trial. We hold that the trial court did not abuse its discretion by denying a new trial on the basis of newly discovered evidence.

## II. SENTENCING

The defendant asserts that the trial court erred by sentencing him in the upper part of Range I. He contends that the trial court erred by applying enhancement factors. However, the defendant does not specify which enhancement factors were inappropriately applied. Rather, the defendant merely "adopt[s] by reference the presentence report and the evidence and argument at the sentencing hearing . . . ." The state argues that the defendant waived the issue by failing to present any argument with citation to authorities as required by Rule 27(a)(7), T.R.A.P. We agree that the defendant failed to follow the requirements of Rule 27(a)(7). The defendant's contention tells us nothing. The burden on appeal is on the defendant to show that the sentence imposed is improper. T.C.A. § 40-35-401(d), Sentencing Commission Comments. "With the trial court's determinations being presumptively correct, it is not our function to rummage through the record to glean support for a defendant's general claim of excessive sentencing and such a claim runs a high risk of the sentence being summarily affirmed." State v. Richard J. Crossman, No. 01C01-9311-CR-00394, Wilson County, slip op. at 12 (Tenn. Crim. App. Oct. 6, 1994), app. denied (Tenn. Jan. 3, 1995).

In any event, the record supports the sentence imposed by the trial court. The presentence report shows that the then thirty-two-year-old defendant has a prior conviction for driving under the influence of an intoxicant (D.U.I.) in 1993. It reflects that the defendant committed the present crime while on probation for the D.U.I. conviction. The report states that the defendant is a high school graduate who attended college for a period of time, leaving for financial reasons. It shows that the defendant had maintained gainful employment but that he had been involved in altercations with several coworkers at his most recent job. The defendant denied that he used alcohol or drugs at the time of the presentence interview.

At the conclusion of the sentencing hearing, the trial court found the following enhancement factors applicable pursuant to T.C.A. § 40-35-114:

> (1) the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

> (5) the defendant treated the victim with exceptional cruelty during the commission of the offense;

> (8) the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;

> (9) the defendant possessed or employed a deadly weapon during the commission of the offense; and

> (15) the defendant abused a position of private trust.

The trial court gave greater weight to enhancement factors (5) and (9). In mitigation, the court considered the defendant's lack of a prior felony record and his history of being gainfully employed and supporting himself, stating that the mitigating factors were "significant." See T.C.A. § 40-35-113(13). The court stated that a twenty-five year sentence was appropriate based upon the applicable enhancement factors, but it reduced the sentence to twenty-two years given the applicable mitigating factors.

The record reflects that the trial court properly followed the sentencing principles and considered all relevant facts and circumstances. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The record supports the trial court's sentencing decision.

In consideration of the foregoing and the record as a whole, we affirm the trial court's judgment of conviction.

_____
Joseph M. Tipton, Judge

CONCUR:

_____
Jerry L. Smith, Judge


_____
Thomas T. Woodall, Judge