# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### AUGUST SESSION, 1998

FILED

March 31, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 01C01-9706-CC-00231 |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | MARION COUNTY |
| VS. | ) | |
| | ) | HON. BUDDY PERRY |
| JOSEPH MARTIN THURMAN,) | | JUDGE |
| | ) | |
| Appellant. | ) | (Direct Appeal - Premeditated First |
| | ) | Degree Murder) |

FOR THE APPELLANT:

HOWARD B. BARNWELL, JR.
829 McCallie Avenue
Chattanooga, TN  37403

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

TIMOTHY F. BEHAN
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN  37243

J. MICHAEL TAYLOR
District Attorney General

STEVE STRAIN
Assistant District Attorney
Jasper, TN

ORDER FILED _____

AFFIRMED

JERRY L. SMITH, JUDGE

# OPINION

The appellant, Joseph Martin Thurman, was convicted by a Marion County jury of one (1) count of premeditated first degree murder and one (1) count of arson. He was sentenced to concurrent sentences of life imprisonment for murder and three (3) years for arson. On appeal, he claims that the trial court erred in (1) failing to suppress his statements to law enforcement authorities; and (2) denying a continuance and/or sanctions after the state failed to comply with discovery requests. After a thorough review of the record before this Court, we find no reversible error and affirm the judgment of the trial court.

## FACTS

On January 17, 1995, emergency fire personnel received a call regarding a burning mobile home in Bledsoe County. The mobile home belonged to the appellant and his wife, Elizabeth Thurman. After approximately two hours, emergency personnel were able to stop the fire, but the mobile home received extensive damage as a result. Authorities later recovered the burned body of Elizabeth Thurman in the area of the master bedroom.[1]

When questioned regarding the incident, appellant denied any knowledge of how the fire started. Appellant told investigators that he left the trailer at approximately 2:00 p.m., and when he returned approximately one and one-half hours later, he found the trailer burning. However, upon further investigation,

---

[1] According to William Barker, an arson investigator with the State Fire Marshall's Office, the fire burned through the floor in the master bedroom, so that the victim's body was actually on the ground in the area where the bedroom had been previously.

authorities were able to eliminate accidental causes of the fire. Instead, the investigators found evidence that accelerants were used in starting the fire.

Dr. Charles Harlan performed an autopsy on the body of Elizabeth Thurman. Dr. Harlan found a negative carbon monoxide level in the victim's blood, which indicated that the victim died prior to the fire. Further, Dr. Harlan found no soot or smoke in the victim's trachea, which also indicated that the victim's death occurred prior to the fire. Dr. Harlan determined that the victim did not die as a result of natural causes, a gunshot wound or sharp force trauma, but could not eliminate suffocation or strangulation as a cause of death. Due to the extensive burn damage to the victim's body, the doctor could not determine the precise cause of death.

In the course of his investigation, TBI Agent David Emiren interviewed the appellant in May of 1995. When confronted with the information that his wife did not die as a result of the fire, appellant told Emiren that Elizabeth committed suicide by hanging herself. He claimed that when he discovered his wife's body, there was a fire burning in the middle of the bedroom. According to appellant, he then decided to let the fire burn in order to conceal his wife's suicide.

After appellant gave the statement, Emiren asked him if he would consent to take a polygraph examination, to which appellant agreed. At the conclusion of this examination, appellant changed his story once again. In this statement, appellant admitted that he and his wife were having marital problems. On the day of the fire, he and Elizabeth had gotten into an argument in the master bedroom. Elizabeth left the bedroom and returned with a jug of kerosene. The victim then poured the kerosene onto some clothes on the floor and ignited a lighter. Appellant told Agent Emiren that he grabbed the lighter from her hands, threw it down, and the room caught on fire. The victim physically attacked him, and in an

effort to subdue her, the appellant placed his hands around his wife's neck and choked her. Appellant stated, "I don't know what happened. I don't know if I broke her neck or if I just choked her too hard. The next thing I knew was that we were laying on the floor and I was shaking her trying to get her up." Appellant told Emiren that he then left the trailer, not knowing whether the fire was still burning.

Appellant was placed under arrest and subsequently charged with first degree murder and arson. At trial, the state presented testimony that the appellant had a long-term romantic relationship with Michelle Hamby, a co-worker of appellant and the victim. Although Hamby testified that her relationship with appellant had terminated in October 1994, she acknowledged that she again became intimate with the appellant approximately one month after Elizabeth's death. Other witnesses testified that appellant had announced his desire to kill his wife and had even solicited another to commit the crime in late November of 1994. The state also presented evidence of various insurance policies wherein the appellant was the beneficiary and would gain substantial amounts of money in the event of his wife's death. Further, an employee with the Tennessee Valley Federal Credit Union testified that eight days prior to his wife's death, the appellant opened a single checking account and named his son as the beneficiary.

The appellant testified in his own behalf at trial. Regarding his wife's death, the appellant testified in conformity with his last statement to Agent Emiren, stating that he accidentally choked his wife to death. He stated that he did not know whether the trailer was on fire when he left. When he returned, the trailer had burned partially, and the appellant retrieved some gasoline and poured it in the hallway, causing the fire to ignite once again. When asked why he did

such a thing, appellant replied, "I thought maybe that if it burned the rest of the way up that people would think it was an accident and think that she died in a fire, 'cause I knowed nobody would believe anything I told them."

The jury returned guilty verdicts for one (1) count of premeditated first degree murder and one (1) count of arson. From his convictions, appellant brings this appeal.

## MOTION TO SUPPRESS

Appellant contends that the trial court erred in denying a motion to suppress his statements given to Agent Emiren. He claims that, at the time he was questioned, he had been seized without probable cause; therefore, the statements should have been suppressed as a product of the illegal seizure (so-called "fruit of the poisonous tree"). Additionally, appellant argues that his statements were inadmissible because he requested an attorney during the interview, and that request was ignored by Agent Emiren.

### A.

On May 8, 1995, Agent Emiren and arson investigator William Barker went to the appellant's place of employment to interview him regarding his wife's death. Emiren and Barker arrived at approximately 11:00 p.m., which was the beginning of appellant's work shift at the La-Z-Boy manufacturing plant in Dayton. While Emiren waited outside, Barker went inside the factory and asked if appellant would consent to being interviewed at the TBI office in Chattanooga. Appellant agreed. At this point, Barker advised the appellant that he was not under arrest.

Emiren, Barker and the appellant got into Agent Emiren's vehicle, and Barker read the appellant his Miranda rights. When appellant asked whether he was under arrest, Emiren said, "No" and told appellant that the trip to Chattanooga was totally voluntary. Appellant responded, "that's fine" and signed a written waiver of his rights.

After arriving in Chattanooga, the appellant gave an oral statement to Emiren, wherein he claimed that his wife had committed suicide. Appellant then agreed to take a polygraph examination, conducted by TBI Special Agent Malcolm Elrod. Before administering the test, Elrod read the appellant his Miranda rights, and the appellant signed a waiver of his rights, as well as a document consenting to the test. After Elrod completed his interview, the appellant gave his second statement to Emiren.

At the hearing on the motion to suppress, the appellant testified that he felt as if he were under arrest at the time he was questioned. However, he acknowledged that when he asked the officers if he was under arrest, they responded, "No." Appellant stated that, when confronted with the waiver of rights form, he did not read the form or listen to his Miranda rights, but "just signed whatever." He testified that Emiren and Barker would not let him retrieve his keys and wallet or move his illegally parked car prior to traveling to Chattanooga. He further stated that Emiren threatened him during the interview, and that he felt intimidated into giving a statement. Appellant testified that he asked Emiren, "do I need an attorney?" According to appellant, Emiren replied, "[t]hat's your right" and continued the interview. Appellant testified that he wanted an attorney present during the interview, but due to the lateness of the hour, did not feel as if he could contact an attorney.

Emiren and Barker testified at the hearing that appellant voluntarily accompanied them to Chattanooga. Emiren stated that they spoke with appellant at night because his work shift began at 11:00 p.m., and they wanted to ensure that appellant was well-rested during the interview. Emiren did not recall appellant ever asking to move his vehicle or retrieve his keys and wallet. Barker, Emiren and Elrod testified that appellant never requested an attorney or inquired whether he needed one. Further, Emiren stated that if appellant had requested counsel, he would have stopped all conversation and driven appellant back to Dayton.

The trial court denied the motion to suppress and subsequently filed a written order detailing its findings of fact and conclusions of law. The trial court found that appellant voluntarily accompanied Emiren and Barker to Chattanooga for an interview and "apparently did not believe he was under arrest." The court therefore concluded that appellant was not under arrest during the questioning. Additionally, the trial court found that appellant never requested counsel during the interview. In so finding, the trial court stated, "Mr. Thurman has not hesitated to lie when he thinks it benefits him. His testimony is generally self-serving and lacks credibility." The trial court, therefore, concluded that appellant's constitutional rights were not violated and denied the motion to suppress.

**B.**

A trial court's findings of fact in a suppression hearing will be upheld by this Court unless the evidence in the record preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). In making its determination on a motion to suppress, the trial court "assesses the credibility of the witnesses, determines the weight and value to be afforded the evidence adduced during the hearing, and resolves any conflicts in the evidence." State v. Curtis, 964 S.W.2d 604, 608

(Tenn. Crim. App. 1997). The prevailing party in the trial court is entitled to the strongest legitimate view of the evidence presented at the suppression hearing as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Odom, 928 S.W.2d at 23. However, an appellate court is not bound by the trial court's conclusions of law. State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

## C.

A person is "seized" within the meaning of the Fourth Amendment if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). Examples of circumstances which might indicate a seizure would be:

> the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. . . . In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

United States v. Mendenhall, 446 U.S. at 554-55, 100 S.Ct. at 1877 (citations omitted).

The question in the present case becomes whether the appellant's consent to accompany Emiren and Barker to the TBI offices was voluntarily given or rather was the product of duress or coercion, express or implied. State v. Bragan, 920 S.W.2d 227, 243 (Tenn. Crim. App. 1995). Under Mendenhall, this Court is instructed to look to the totality of the circumstances. 446 U.S. at 557, 100 S.Ct. at 1879.

The present case is closely analogous with the case of State v. Bragan, *supra*. In that case, the defendant and his wife were asked by police officers to

-8-

accompany the officers to the police services building to give a statement regarding the death of defendant's business partner. Id. at 243. The defendant agreed, but claimed that the officers would not allow him to drive his own car to the station. Id. He testified at the motion to suppress hearing that the tone of the officer's voice made him feel compelled to go to the police station. Id. When they arrived at the station, the officers read the defendant and his wife their Miranda rights, and they answered the officers' questions. Id.

This Court held that the defendant and his wife were not "seized" at the time they were questioned. Id. In so holding, the Court noted the lack of threats or coercion when the police requested that the defendant accompany them to the station. Id. The Court stated that defendant's testimony at the hearing "clearly indicated that he voluntarily agreed to accompany the police officers to the police services building." Id. The Court determined that, although the defendant claimed that he did not feel free to decline the officer's request, the totality of the circumstances supported the conclusion that defendant and his wife were not "seized." Id.

In the present case, Emiren and Barker requested that the appellant accompany them to the TBI office in Chattanooga for an interview concerning the victim's death. They advised the appellant that the interview was voluntary, and that he would not be compelled to accompany them. Although Appellant testified that he believed he was under arrest, he acknowledged that when he inquired on several occasions whether he was under arrest, Emiren and Barker responded, "No." Furthermore, the appellant does not allege that he was physically compelled to leave his place of employment with the officers.

Under the totality of the circumstances, the record supports the trial court's finding that Appellant voluntarily accompanied Emiren and Barker to the TBI

office.  Furthermore, we agree with the trial court's conclusion that the appellant was not "seized" under the Fourth Amendment.  Therefore, his statement was properly admissible.

This issue is without merit.

## D.

Appellant also argues that he made an equivocal request for counsel when he asked Agent Emiren, "do I need an attorney?"  Therefore, he maintains that any further interrogation by Emiren should have been limited to questions clarifying the appellant's desire for an attorney.  *See* State v. Stephenson, 878 S.W.2d 530, 547 (Tenn. 1994).

The trial court found that the appellant did not make a request for counsel, equivocal or unequivocal.  In making this determination, the court explicitly found that appellant's testimony was incredible, thereby accrediting the testimony of the state's witnesses.  The determination whether the appellant made a request for an attorney, equivocal or unequivocal, is a question of fact for the trial court to determine. State v. Farmer, 927 S.W.2d 582, 594 (Tenn. Crim. App. 1996).  The trial court disbelieved the appellant's testimony in this regard, and the evidence in the record does not preponderate otherwise.  As a result, the appellant's statement was admissible, and the trial court properly denied the motion to suppress.

This issue has no merit.

## DENIAL OF CONTINUANCE / SANCTIONS

In his final issue, the appellant claims that he was denied his constitutional rights to a fair trial, due process, effective assistance of counsel and confrontation

due to the state's failure to comply with discovery rules. He argues that the trial court committed reversible error by failing to impose sanctions against the state as a result of such discovery violations. He further contends that the trial court erred in denying his motion for a continuance.

**A.**

The following sequence of events represents an apparent gross miscommunication among the defense attorneys, the prosecuting attorneys, and the medical examiner's office. The certificate of death initially listed the cause of Elizabeth Thurman's death to be "burns." The death certificate was signed by Dr. Charles Harlan and dated January 24, 1995. However, in the autopsy report signed by Dr. Harlan and dated April 17, 1995, the cause of death was listed as "undetermined." As Dr. Harlan explained at trial, due to a negative carbon monoxide level in the victim's blood as well as the lack of smoke or soot in the victim's trachea, he determined that the victim did not die as a result of the fire. Further, due to the severity of the burn damage, Dr. Harlan could not determine the exact cause of death.

During the autopsy process, Dr. Harlan made various pictures of the victim's body. Although the photographs were subject to discovery pursuant to Tenn. R. Crim. P. 16, the defense had not received the photos as of September 1996. On September 20, 1996, Assistant District Attorney James Pope transmitted correspondence to Howard Barnwell, defense counsel, that the photographs were available to view at Dr. Harlan's office.

Two days later, defense counsel filed a motion for sanctions due to the state's failure to comply with discovery requests. On September 24, the trial court conducted a hearing with the parties regarding the state's failure to produce the photographs. Stan Carney, an employee with Dr. Harlan's office, testified

that he received a request from Mr. Barnwell's office for the autopsy photographs, as well as enlargements and the negatives. Carney placed an order with Moto Photo for the photographs plus an extra set of negatives on April 25, 1996. Thereafter, he retrieved the order and mailed it to Barnwell's office on June 15. According to Mr. Barnwell, however, the photographs and negatives were never received at his office. After an inquiry by the District Attorney's office, Carney checked Elizabeth Thurman's autopsy file and noticed that the original autopsy photographs and negatives were missing.

Dr. Harlan also testified at the hearing. He stated that the photographs depict the victim's burned body, but were not helpful in making his autopsy determinations. He also checked the autopsy file of the victim and could not locate the photographs or negatives. He further testified that, in his opinion, another similarly qualified pathologist could not determine the cause of death merely by viewing the autopsy photographs.[2]

At the conclusion of the hearing, the trial court found that Mr. Carney mailed the photographs, but those photographs were apparently misplaced in the mail. Further, the court found that the loss of the photographs was accidental.

Subsequently, Mr. Carney located the original autopsy photographs and negatives in another file the medical examiner's office. The trial court held another hearing, where defense counsel requested a continuance and/or the exhumation of the decedent's body. After reviewing the photographs which were delivered by Mr. Carney, the trial court denied the motion for a continuance,

---

[2] During the course of this hearing, Dr. Harlan agreed to send samples of the victim's trachea as well as the internal organs to the defense's expert for examination, which were received by the Fulton County Medical Examiner's Office.

implicitly finding that the photographs were of no benefit to either party. Furthermore, the trial court denied the motion for a continuance.

**B.**

Tenn. R. Crim. P. 16(d)(2) provides the sanctions that a trial court may order if a party fails to comply with discovery. The rule states:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances. The court may specify the time, place, and manner of making the discovery and inspection and may prescribe such terms and conditions as are just.

The sanction to be imposed for non-compliance must fit the circumstances of the individual case. State v. Street, 768 S.W.2d 703, 710 (Tenn. Crim. App. 1988).

The decision whether to grant a continuance is a matter that is within the sound discretion of the trial court. State v. Griffis, 964 S.W.2d 577, 593 (Tenn. Crim. App. 1997); Harris v. State, 947 S.W.2d 156, 173 (Tenn. Crim. App. 1996). This Court will not interfere with the trial court's decision in this regard unless the evidence in the record indicates an abuse of discretion. State v. Griffis, 964 S.W.2d at 593.

In this case, the defense was unable to view the autopsy photographs until one day prior to trial. However, Dr. Harlan testified that the photographs were of no benefit to anyone, and no other similarly qualified pathologist could have determined the cause of death merely by viewing them. The trial court agreed. Upon our viewing of the photographs, we reach the same conclusion. The photographs depict the burned body of Elizabeth Thurman, and, as Dr. Harlan described, "all they show is a lump of black." No amount of time could transform these photographs into material evidence.

-13-

Furthermore, contrary to appellant's assertion, the cause of death was not an issue at trial. The appellant testified that he accidentally choked or strangled his wife to death and then left her in their mobile home to burn. The only issue before the jury was whether the victim's death was accidental or intentional.

Additionally, an exhumation of the victim's body would have been fruitless. As Dr. Harlan testified at trial, after the autopsy has been conducted, the deceased's internal organs are removed from the body and cremated. Thus, there would be no evidence for the defense expert to examine. Moreover, the defense expert was provided with a tissue sample of the victim's trachea and internal organs prior to trial.

The appellant has not demonstrated how he was prejudiced by the alleged trial court errors. *See* State v. Griffis, 964 S.W.2d at 593; State v. Hix, 696 S.W.2d 22, 25-26 (Tenn. Crim. App. 1984). We, therefore, conclude that the trial court did not abuse its discretion by denying a continuance or other sanctions as a result of the state's failure to comply with discovery.

### C.

This Court further holds that the appellant's constitutional rights were not offended by any discovery violation. In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." *See also* Hartman v. State, 896 S.W.2d 94, 101 (Tenn. 1995). In order to establish a due process violation under Brady, four prerequisites must be met:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). As we have determined previously, the photographs at issue were not favorable evidence for the appellant. By the same token, there has been no showing that the photographs were material evidence. As a result, there was no due process violation under Brady v. Maryland.

Furthermore, in Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the majority opinion held that failure to preserve potentially useful evidence can be a denial of due process if the defendant can show bad faith on the part of the police. The Court noted that the presence of bad faith necessarily turns on the police's knowledge of the exculpatory nature of the evidence at the time it is lost or misplaced. Id. at 56, 109 S.Ct. at 336. In the present case, the trial court found no bad faith on the part of the state, and we see no evidence to the contrary in the record. Additionally, the photographs can hardly be viewed as "potentially useful" to the defense. Appellant's due process rights were not violated under Youngblood.

This issue is without merit.

## CONCLUSION

A thorough review of the briefs and record in the case convinces us there is not reversible error in this case. Accordingly, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE


CONCUR:


_____
DAVID G. WELLES, JUDGE


_____
JOHN K. BYERS, JUDGE